# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHASE CROSSROADS WATERFORD SQUARE, LLC, | : | CIVIL ACTION NO. 3:03CV00432 (JCH) |
| | : | |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| THE MAY DEPARTMENT STORES COMPANY, | : | JUNE 8, 2006 |
| | : | |
| Defendant. | : | |

## PRETRIAL MEMORANDUM

Pursuant to Local Rule 6 of Civil Procedures and the Standing Order Regarding Trial Memoranda in Civil Cases, the parties in the above-entitled matter hereby submit their joint pretrial memorandum.

### 1. **TRIAL COUNSEL**

For the plaintiff:

Richard P. Weinstein, Esquire
Weinstein & Wisser, P.C.
29 South Main Street, Suite 207
West Hartford, CT 06107
Phone: 860-561-2628
Fax: 860-521-6150

For the defendant:

Jeffrey J. Tinley, Esquire
Tinley, Nastri, Renehan & Dost, LLP
60 North Main Street, 2nd Floor
Waterbury, CT  06702-1403
Phone:  203-596-9030
Fax:  203-596-9036

David Martin, Esquire
Federated Department Stores, Inc.
611 Olive Street
Suite 1750
St. Louis, MO  63101
Phone:  314-342-6719

## 2.    **JURISDICTION**

Jurisdiction is based on 28 U.S.C. 1332 (diversity) (breach of contract).

## 3.    **JURY/NON-JURY**

This matter is a non-jury matter.

## 4.    **LENGTH OF TRIAL**

Three to five days.

## 5.    **FURTHER PROCEEDINGS**

None.

6.    **NATURE OF CASE**

    a.    **Plaintiff's Claim:**

The claim is based on a guaranty from Associated Dry Goods, which entity was acquired by the defendant May Department Stores. The guaranty is of a Caldor lease, which lease is dated November 23, 1983, and was to expire on January 31, 2014. While the lease was assumed by Ames Department Stores ("Ames") in April of 1999, Ames filed bankruptcy in August of 2001, and the subject lease was rejected in bankruptcy on February 14, 2003. The claim is for damages arising under the guaranty arising from the termination of the subject lease. The plaintiff has secured a replacement tenant, Lowe's Home Centers, Inc., which commenced paying rent in January of 2006, in order to mitigate its damages.

    b.    **Defendant's Claim:**

        i. **The Caldor Lease and Guaranty**

In 1983, a predecessor to the present plaintiff, Chase Crossroads, LLC ("Chase Crossroads"), leased retail space to the now-defunct Caldor Corporation ("Caldor") as the anchor tenant for a strip mall shopping center located in Waterford, Connecticut. The lease called for annual rental payments during an initial lease term that extended to 2014.

As landlord, Chase Crossroads bore responsibility for common area maintenance, taxes and insurance during the initial year, which was denominated a "base year." In subsequent lease years, the tenant was responsible to pay for any increases in these items over the amount paid in the base year. American Dry Goods Corporation ("ADG"), Caldor's parent company, guaranteed Caldor's lease obligations. In the fall of 1986, The May Department Stores Company ("May") merged with ADG. The present claim against May asserts that it is a successor to ADG and obligated to Chase Crossroads under the guaranty.

### ii. The "Key Tenant" Provision

In the Caldor lease, the landlord agreed to put in place a first class supermarket as a "key tenant" and agreed that if such a tenant was not put in place the tenant could, at any time thereafter, terminate the lease. A supermarket has never taken occupancy at the center and the lease has been terminated by virtue of its rejection by Ames, the successor tenant to Caldor, in the Ames' Chapter 11 case, as well as by actions of the plaintiff that had the effect of terminating the lease.

### iii. The Caldor Bankruptcy

In 1995, Caldor filed a Chapter 11 bankruptcy case in the Southern District of New York. In that case, Caldor assumed the subject lease and cured defaults under the lease. Pursuant to an Order entered in Caldor's Chapter 11 case in 1999, Caldor sold its

leasehold interest in the subject property (along with its leasehold interest in numerous other properties) to an affiliate of Ames Department Stores ("Ames").

Chase Crossroads accepted Ames as a substitute tenant and Ames' parent guaranteed its obligations to Chase Crossroads under the lease. Chase Crossroads continued to assert claims against Caldor in the bankruptcy court for certain sums it claimed were owed during the period of Caldor's tenancy. In October 2000, Caldor and Chase Crossroads settled those claims pursuant to a letter agreement by which Chase Crossroads agreed to accept a payment from Caldor as "full and complete resolution of all of its claims" and Chase Crossroads released "the Debtor [Caldor] its parents, subsidiaries and affiliates and the directors, officers, attorneys employees." May asserts that this agreement, by its express terms, operated to release all claims against Caldor, its parent and its affiliates, and thereby discharged any further obligations under the Guaranty.

### iv. Lease Modifications, Restrictions and Exclusives

May asserts that any obligations under the Guaranty also were discharged by virtue of a series of lease modifications to which the Guarantor did not consent, as well as by various exclusive uses and restrictions granted by the landlord to other tenants that dramatically diminished the marketability of the Caldor's site and thereby materially increased the Guarantor's risk and exposure under the Guaranty, without its consent.

Among the tenants granted exclusive uses and restrictions that directly interfered with efforts to re-let the Caldor's site was Bob's Discount Stores ("Bob's"). In April 1995, Chase Crossroads leased the second largest space in the center, approximately 50,000 square feet, to Bob's. This lease created two issues relevant to the present dispute. First, the lease to Bob's violated a provision of the Caldor lease by which the landlord agreed that it would not lease space in the center to another "department store" occupying 10,000 square feet or more. Second, included in the terms of the Bob's lease are certain exclusive uses granted to Bob's that dramatically affected, along with other exclusive uses granted to other tenants, the plaintiff's ability to re-lease the vacant Caldor space and led to the abandonment of a potential tenancy that would have served as an economic replacement for the Caldor/Ames rent.

### v. Ames' Bankruptcy and the Burlington Coat Factory Deal

In August 2001, after it had been in possession and operating a retail department store at the subject site for a number of months, Ames became a debtor in a Chapter 11 Bankruptcy case. Ames subsequently abandoned the premises and rejected the lease in its bankruptcy case. In February 2003, Chase Crossroads informed May that Ames had rejected the lease, and made demand upon May for rent through the expiration of the lease term in 2014.

After Ames rejected the subject lease, Chase Crossroads hired a leasing agent who began discussions with Burlington Coat Factory to take over the Caldor/Ames space,

initially contemplating a Fall 2003 opening. Except for certain costs of relocation, the Burlington Coat Factory lease terms, if consummated, would have constituted an economic replacement for the Caldor/Ames rent.

However, the Burlington Coat Factory deal did not come to fruition for two principal reasons: (1) Chase Crossroads could not conclude a lease with Burlington Coat Factory without violating the terms of the exclusive uses it had granted in Bob's lease in 1995; and (2) Chase Crossroads decided to pursue a significantly more lucrative deal with Lowe's Home Centers that required demolition of the former Caldor's building to make way for a Lowe's Home Center, with all construction expense borne by Lowe's. Lowe's occupancy was proposed to be pursuant to a long-term ground lease under which Lowe's would bear all maintenance, taxes, and other expenses associated with the leasehold site. By early 2004, Lowe's real estate committee preliminarily approved the Chase Crossroads site. At that point, Chase Crossroads abandoned the potential Burlington Coat Factory deal and devoted its full attention to obtaining the necessary approvals to proceed with the Lowe's deal.

After a protracted period during which Lowe's and Chase Crossroads negotiated lease terms, sought municipal approvals, demolished the former Caldor building, and ultimately built a new and larger Lowe's facility, Lowe's opened in late January 2006. There is now in place a definitive long-term ground lease agreement between Lowe's and Chase Crossroads for a parcel of over 11 acres within the Chase Crossroads center. A

building of approximately 135,000 square feet is located on the site, as well as a garden area of approximately 30,000 square feet. In order to accommodate the larger Lowe's structure, Chase Crossroads relocated several tenants within the center and moved several tenants out of the center.

### vi. Damages

The net leasing revenues the plaintiff derives from the Lowe's ground lease significantly exceed the net revenues it would have derived from Caldor for the balance of the stated term of the Caldor's lease. Moreover, the Lowe's lease is a long-term ground lease with an initial term of twenty years and significant rent increases in later years, as well as in renewal terms. In addition, Chase Crossroads was able to obtain setback and parking requirement variances that enabled it accommodate the larger Lowe's structure and productively utilize a much greater portion of the site. The location of a new Lowe's Home Center at Chase Crossroads has significantly enhanced the long-term value of the site, making it a "destination" shopping center, and it has enabled Chase Crossroads to seek rental rates for the balance of the center that are at the top of the local market for retail space.

Notwithstanding the short-term and long-term benefits the plaintiff has realized by pursuing its plan to abandon and demolish the former Caldor building, thereby rendering "mitigation" in any legally supportable sense impossible, Chase Crossroads seeks damages from May based upon the full remaining Caldor's lease term, through the

year 2104, as well as millions of dollars in costs it claims to have incurred in relocating and granting concessions, as well as a myriad of transaction costs associated with the Lowe's deal.  In various iterations of its damages analysis, Chase Crossroads has asserted that it has sustained "damages" of between approximately $4.5 and $6 million.

May maintains that it has complete defenses to the plaintiff's damages claims. Moreover, even if May's complete defenses are not upheld, May maintains that any claim for damages under the guaranty terminated as of the time that Chase Crossroads determined no longer to mitigate damages by finding a replacement tenant for the former Caldor's site, but decided instead to pursue a course of demolishing the Caldor's building and radically reconstructing the center to improve both its short-term return and its long-term economic value to Chase Crossroads as the owner of the center.  May maintains that by pursuing the Lowe's deal, the plaintiff realized a substantial net financial benefit and that the sums it claims are not properly recoverable as "mitigation" damages.

      b.    Not applicable.

      c.    See "Defendant's Claim," above.

      d.    Not applicable.

7.     **TRIAL BY MAGISTRATE JUDGE**

Not applicable.

8.     **LIST OF WITNESSES**

**Plaintiff's witnesses:**

1.     Ernest Porco, Senior Vice President for Real Estate, Chase Enterprises, One Goodwin Square, Hartford, Connecticut, the entity that manages the subject shopping center, who has overall responsibility for all Chase real estate assets.  Porco will testify in particular concerning the attempt to involve the defendant May to assume control over the space when Ames was in bankruptcy to protect the benefits afforded by the underlying Caldor lease, efforts to have the defendant consider a sublease with Burlington Coat Factory, the failure of the defendant to pursue same, the subsequent rejection of the lease, the engagement of Daniel Zelson to re-let the space, the ultimate determination to enter into a ground lease with Lowe's, the reasons for same, the efforts required in order to accommodate Lowe's, and the damages incurred.

2.     Daniel Zelson, Charter Realty & Development Corporation, 411 West Putnam Avenue, Suite 111, Greenwich, Connecticut, will testify in regard to efforts to re-let the subject space.

3.     Jonathan Mellitz, In-House Counsel for Chase Enterprises, Goodwin Square, Hartford, Connecticut, will testify in regard to efforts to have May protect the subject lease and to regain possession of same from Ames, the subsequent rejection of the lease, the existence of exclusives and difficulties in regard to re-letting to such potential

tenants as Burlington Coat Factory, the negotiations and leasing of the subject space to Lowe's.

      4.      Kenneth Mandelbaum, KAM Management, LLC, 15 Bleeker Street, Suite 203, Millburn, New Jersey, will testify about the marketplace, strip shopping centers, the practice to provide tenants with exclusives, the similarities between goods sold at a Bob's Stores operation and those sold at a Burlington Coat Factory, the differences between those operations and a Caldor or Ames store.  Mr. Mandelbaum will also discuss difficulties in the marketplace, especially as competition and new shopping centers become available.  (Mandelbaum may testify in the case in chief, or may testify as a rebuttal witness.)

      5.      Arnold J. Grant, Arnold J. Grant Associates, 1010 Wethersfield Avenue, Suite 301, Hartford, Connecticut, real estate appraiser, will testify as a rebuttal witness, assuming that the defendant calls its real estate appraiser, Leary, to critique the analysis performed by Leary.

      6.      Dawn Kelley, an accountant at Chase Enterprises, Goodwin Square, Hartford, Connecticut, will be available to testify in regard to any of the underlying expenses claimed by way of damages, and will have all supporting documentation available.  It is the plaintiff's intention to use a damage summary rather than to introduce each individual document supporting the claim for damages.

**Defendant's Witnesses:**

1. All witnesses listed or called by plaintiff.

2. John J. Leary, MAI, CRE, FRICS, will testify as an expert witness to the matters discussed in his disclosure and expert witness reports regarding the damages claimed by the plaintiff in this case.

3. Robert Soshnik, may testify, if necessary, as to his role as in-house counsel to the May Company, his discussions with representatives of the plaintiff and others relating to the Caldor lease, prospective tenants, the bankruptcy proceedings involving Caldor and Ames, including issues relating to assumption, rejection, termination and assignment of the lease for the premises in question, efforts by the plaintiff to re-let the subject premises, the by the plaintiff to abandon such efforts and to demolish the premises so that a Lowe's facility could be constructed, the events surrounding and leading up to the Lowe's transaction, and any claims with regard to any statements or representations alleged to have been made by Mr. Soshnik with regard to any of the foregoing, including any statements or representations regarding May's position or May's consent to or approval of any actions taken by the plaintiff.

4. Jon Mellitz will testify as to the subjects identified by the plaintiff, above, and to the fact that the plaintiff recognized that it could not proceed with a lease of the former Caldor site to Burlington Coat Factory, or any tenant whose use would conflict with exclusive uses or restrictions in other leases. Mr. Mellitz also is expected to testify

regarding the agreements, negotiations and transactions related to the several bankruptcies of tenants at the center.

5. Rodney Haynes, former Senior Vice President of May Realty, is expected to testify as an expert witness that the Bob's lease violates the terms of the Caldor lease and that the lease restrictions and exclusives granted to Bob's were inappropriate given the size of the Bob's store in relation to the rest of the center. He is expected to testify further that other restrictions or exclusives granted by the plaintiff to tenants in or adjacent to the center were inconsistent with its obligations under the Caldor lease and inappropriate. He is also expected to testify that Bob's meets the definition of a "department store." He is further expected to testify that the combination of exclusives and restrictions granted to other tenants impaired the value of the Caldor leasehold, greatly diminished the size of the pool of potential tenants to take over the site, and substantially impairing the landlord's ability to re-let the former Caldor's site, thereby increasing the risk and exposure of one who would guaranty the payment of rent by a tenant such as Caldor. He is also expected to testify that the Burlington Coat Factory deal as reflected in a letter of intent between Burlington Coat Factory and Chase Crossroads represented a fair and reasonable deal and that the location of a Lowe's Home Center on the property is an appropriate use from the landlord's perspective. He is also expected to testify that in his opinion the landlord's efforts to market the former Caldor's site were

not adequate and that the landlord's actions in general reflected a disregard for the rights of the guarantor of the Caldor lease.

6. Daniel Zelson, a leasing broker with Charter Realty, is expected to testify as to his efforts to re-let the former Caldor's site, his involvement in negotiations and discussions with various prospective tenants, including Burlington Coat Factory and Lowe's and as an expert witness in accordance with his disclosure, with respect to the real estate market in Connecticut and in the vicinity of the Chase Crossroads center and the expected time to lease a space such as the former Caldor's site, as well as the effect of lease restrictions and exclusives on the ability to re-lease such a site.

7. A representative of Burlington Coat Factory is expected to testify as to the negotiations and discussions surrounding the potential lease of the former Caldor's site by Burlington Coat Factory, the terms of proposals for such a lease, the bankruptcy issues and the lease exclusives and restrictions that affected the site, and the reasons that a lease was not consummated.

8. Peter Brawley, Asset Manager of the Shopping Center Division of Chase Management, LLC, a subsidiary of Chase Enterprises, responsible for the management of the Chase Crossroads shopping center for approximately the past 7 to 8 years, is expected to testify regarding the relocation of tenants within the shopping center in connection with the Lowe's project. He is also expected to testify regarding the current vacancy at the center, the market for rental space at the center and marketing efforts. He is expected

to testify regarding his interactions with leasing agents for the center and with Ernest Porco regarding marketing the center and mitigation efforts. His is expected to testify concerning negotiations and discussions with Lowe's and with other potential tenants, exclusive use provisions and other issues that arose in the course of such discussions, and his analysis and recommendations with respect to Burlington Coat Factory, Lowe's and other potential tenants and his comparison of the potential revenues with the payments called for under the Caldor/Ames leases. He is further expected to testify as to his role in overseeing the permitting process for the reconstruction of the center in connection with the Lowe's transaction, including issues relating to parking and setback variances. He is expected to testify that Chase had recognized the Bob's restrictions would be an impediment to a number of potential tenancies for the Caldor site, including Burlington Coat Factory. He is also expected to testify that there were only relatively minor other issues separating Chase and Burlington Coat Factory. He is expected to testify that the Lowe's proposal required moving only one tenant with a lease in place and that for several reasons the proposed Lowe's deal was more favorable for Chase.

9. Barry Feigenbaum, Esq., counsel to Chase Crossroads, is expected to testify as to his knowledge and role with respect to the Caldor and Ames bankruptcies, the Odd Lot bankruptcy and with respect to his interactions with representatives of the May Company with respect to Chase's claims in this case.