

ARNOLD J. GRANT ASSOCIATES, INC.
REAL ESTATE APPRAISERS & COUNSELORS

June 19, 2006

Richard P. Weinstein, Esq.
Weinstein & Wisser, P.C.
29 South Main Street Suite 207
West Hartford, CT 06107     via fax 521.6150

1010 WETHERSFIELD AVENUE
HARTFORD, CT 06114
T 860.525.6758
F 860.278.6414

Re: <u>Chase Crossroads Waterford Square, LLC v. The May Department Stores Co.</u>

Dear Attorney Weinstein:

You have asked me to review the materials prepared by Leary and Chase Crossroads Waterford Square, LLC ("Chase Crossroads" or "the property owner") which address the issue of damages associated with the abandonment of the Caldor (Ames) lease. This letter provides a summary of my findings.

<u>Scope of work</u>. I read the materials attached to the Supplemental Expert Witness Disclosure (John Leary), considered the methodology employed by Leary and checked the mathematical accuracy of some of his models. I inspected the subject property. I reviewed documentation provided by Chase Crossroads. I created this letter which provides a summary of findings.

<u>A comment concerning the nature of my work</u>. I have been asked to review two approaches to estimating damage associated with the abandonment of the Caldor (Ames) lease, one prepared by John Leary, one prepared by Chase Crossroads. Leary's report is a draft appraisal. By offering criticism of portions of his report I am performing an appraisal review. The scope of the review is limited to consideration of the appropriateness and application of Leary's valuation methodology. In light of the draft nature of the report I will not comment upon the presentation of the report. In doing the review I have no prior interest concerning the property at issue, no personal bias concerning the subject property or the client, and I have remained dispassionate concerning Leary's work product. The intended users of this letter style limited appraisal review are the parties interested in the litigation.

I have been asked to review the property owner's estimate of damages. The damage calculation was made by the property owner or affiliated employees, the owner's damage calculation is not an appraisal, and my review of the owner's damage calculations is not an appraisal review.

OBSERVATIONS CONCERNING THE LEARY REPORT.
Leary presents a draft real property appraisal concerning potential damage to the leased fee interest reflecting conditions as of 2/1/03. Leary's retrospective appraisal is not labeled as a retrospective appraisal report (perhaps because this was a draft).

Leary estimates the potential damage to the leased fee interest of Chase Crossroads Waterford Square, LLC ("Chase Crossroads") by a series of models which compare the rent generated by the Caldor lease with the subsequent ground lease to Lowe's. I take issue with his decisions concerning discount rates, the term of analysis, his limitation of the study area to the foot print of the Caldor store, and his exclusion of items other than contract rents.

**Use of discounts within the calculation of potential damages.** Leary converts expected future cash flows to a value as of February 1, 2003 via discounting. When estimating the market value of a property as of a specific date it is accepted appraisal practice to discount future cash flows to a present value estimate. In this situation the focus of attention is an estimate of damages. The damage to the lessor's leased fee interest was not confined to February 1, 2003. The lease default was a continuing problem for years and the damage continued for years after February 1, 2003. By reducing differences in future cash flows to discounted present values calculated as of February 1, 2003 Leary underestimates the damages associated with the lease default. Some provision should be made for the lack of receipt of monies through the present date.

Discount rates. If it is appropriate to apply a discount rate to the damage analysis, there should be consistency with respect to discount rates. Leary uses a 12% discount rent for the Caldor lease citing his opinion that the property was a second tier shopping center. He does not discuss the relationship between contract and market lease rates. The 12% rate does not seem to take into account the fact that the Caldor lease was guaranteed by The May Department Stores Company and Associated Dry Goods.

In Scenario I Leary discounts the Lowe's Ground Rent at 7.75%, relying upon the discount rate contained within a ground lease negotiated during 2005. In my opinion it is not appropriate to use an interest rate contained within a ground lease negotiated two years after the date of lease abandonment. Nor is it appropriate to use the Scenario II 9% discount rate to calculate the present value of future income.

Leary's date of valuation is February 1, 2003. If the subject was a second tier shopping center as occupied by Caldors, the nature of the property did not improve when it lost an anchor tenant. As of February 1, 2003 there was no guarantee that Lowe's or an equivalent retailer would be attracted to the subject property. The risks associated with the investment were higher after the default. I do not see a justification for the application of a lower discount rate to the future income.

Selection of terms for analysis.
In Scenario I, Leary estimates the present value of the Caldor rent through 2014, discounted at 12%, to be $2,562,600. He compares this with his estimate of the present value of an allocated portion of the Lowe's ground lease through 2026, which he calculates to be $3,175,100.

It does not make sense to compare an 11 year income stream (Caldor) with a 23 year income stream (Lowe's). The implication of terminating the Caldor income stream analysis at year 11 is that the subject property would not generate any income during years 12-23, which is obviously in error. If you add the present values of the allocation of Lowe's rent at 7.75% generated by Leary for 2004 through 2014 the total is $1,708,463, which is $854,137 less than the present value he presents in Scenario I for the Caldor rent through 2014 ($2,562,600 less $1,708,463 = $854,137).

The same criticism is applicable to Scenario II. Discounted at 9% Leary's calculations indicate a present value of the year 2004 - 2014 allocation of Lowe's rent to be $1,572,951, which is $989,649 less than the present value he presents in Scenario II for the Caldor rent through 2014 ($2,562,568 less $1,572,951 is $989,617).

If the 12% discount rate is applied to the Caldor and Lowe's income streams the difference is about $1,264,000.

In Scenario III Leary selects 1/31/04 as the termination date for the damages associated with the abandonment of the Caldor lease. He selects January 31, 2005 as the termination date in Scenario IV. These dates are not appropriate. They do not reflect the date at which the initial lease was scheduled to terminate. They do not reflect the date at which a replacement tenant commenced payment of rent.

Physical boundaries of comparison. Leary estimates damages through calculations which consider only the footprint of the Caldors building. He does not consider the impact upon the 15,812 s.f. of satellite space which had to be removed to permit development of Lowe's.

Missing elements within Leary's damage estimates.
Leary does not does not consider the cost of marketing or the legal and professional costs associated with the property owner's attempts to secure a new tenant to mitigate the results of the lease abandonment. Leary does not address the loss of income associated with the satellite stores and the costs of relocating these tenants.

OBSERVATIONS CONCERNING THE OWNER'S CALCULATION OF DAMAGES
I reviewed the owner's calculation of damages as presented within the excel file entitled "Crossroads Waterford Square LLC, Loss of Revenue Analysis, Caldor (Ames) - May Co. Guarantee 22-May 06."

The model provides a reasonable estimate of damages. It compares the cash flows associated with the abandoned Caldor lease and 15,185 s.f. of satellite stores with an allocated portion of the Lowe's rent. The allocation, based upon the 82,205 s.f. of the Caldor lease and 15,185 s.f. of the satellite stores is appears reasonable. Contract lease rates are the basis for comparison for the Caldor's and Lowe's income streams. Estimated market rates are used for the 15,185 s.f. of satellite stores. Consideration is given to the costs associated with relocation tenant spaces, and with marketing, legal, professional and financial fees required to secure approvals for the Lowe's replacement space. An allocated portion of these costs is charged against the abandoned lease.

With respect to methodology the analysis is appropriate. I did not check the mathematical accuracy of the model beyond the line entitled "Net loss of revenue claim."

Very truly yours,

Arnold J. Grant, MAI

ARNOLD J. GRANT ASSOCIATES, INC.
1010 WETHERSFIELD AVENUE, HARTFORD, CT 06114
T 860 525.6758, F 860.278.6414

3

Crossroads Waterford Square
Discount Net Loss of Revenue Claim
model: reverse leary s1.123

Scenario I

| Future Year | Calander Year | Caldor (Ames) Net Loss | PV at 12.00% P.Value | Future Year | Calander Year | Lowe's Ground Rent Net Loss | PV at 7.75% P.Value |
|---|---|---|---|---|---|---|---|
| 1 | 2004 | 431,576 | 385,336 | 1 | 2004 | 0 | 0 |
| 2 | 2005 | 431,576 | 344,050 | 2 | 2005 | 0 | 0 |
| 3 | 2006 | 431,576 | 307,187 | 3 | 2006 | 0 | 0 |
| 4 | 2007 | 431,576 | 274,274 | 4 | 2007 | 357,413 | 265,156 |
| 5 | 2008 | 431,576 | 244,888 | 5 | 2008 | 357,413 | 246,084 |
| 6 | 2009 | 431,576 | 218,650 | 6 | 2009 | 357,413 | 228,385 |
| 7 | 2010 | 431,576 | 195,223 | 7 | 2010 | 357,413 | 211,958 |
| 8 | 2011 | 431,576 | 174,306 | 8 | 2011 | 357,413 | 196,713 |
| 9 | 2012 | 431,576 | 155,631 | 9 | 2012 | 393,154 | 200,820 |
| 10 | 2013 | 431,576 | 138,956 | 10 | 2013 | 393,154 | 186,376 |
| 11 | 2014 | 431,576 | 124,068 | 11 | 2014 | 393,154 | 172,971 |

Net Present Value: 2,562,568

Net Present Value: 1,708,462

Indicated Damages Arising From Difference in Rent: 854,107

4

Discount Net Loss of Revenue Claim
model: reverse leary s1.123

Scenario II

| Future Year | Calander Year | Caldor (Ames) Net Loss | PV at 12.00% P.Value | Future Year | Calander Year | Lowe's Ground Rent Net Loss | PV at 9.00% P.Value |
|---|---|---|---|---|---|---|---|
| 1 | 2004 | 431,576 | 385,336 | 1 | 2004 | 0 | 0 |
| 2 | 2005 | 431,576 | 344,050 | 2 | 2005 | 0 | 0 |
| 3 | 2006 | 431,576 | 307,187 | 3 | 2006 | 0 | 0 |
| 4 | 2007 | 431,576 | 274,274 | 4 | 2007 | 357,413 | 253,200 |
| 5 | 2008 | 431,576 | 244,888 | 5 | 2008 | 357,413 | 232,294 |
| 6 | 2009 | 431,576 | 218,650 | 6 | 2009 | 357,413 | 213,114 |
| 7 | 2010 | 431,576 | 195,223 | 7 | 2010 | 357,413 | 195,517 |
| 8 | 2011 | 431,576 | 174,306 | 8 | 2011 | 357,413 | 179,374 |
| 9 | 2012 | 431,576 | 155,631 | 9 | 2012 | 393,154 | 181,019 |
| 10 | 2013 | 431,576 | 138,956 | 10 | 2013 | 393,154 | 166,072 |
| 11 | 2014 | 431,576 | 124,068 | 11 | 2014 | 393,154 | 152,360 |

Net Present Value: 2,562.568         Net Present Value: 1,572,950

Indicated Damages Arising From Difference in Rent:         989,618

Crossroads - Waterford Square
Discount Net Loss of Revenue Claim
model: reverse leary s1x.123

Scenario I, with uniform discount rate.

| Future Year | Calander Year | Caldor (Ames) Net Loss | PV at 12.00% P.Value | Future Year | Calander Year | Lowe's Ground Rent Net Loss | PV at 12.00% P.Value |
|---|---|---|---|---|---|---|---|
| 1 | 2004 | 431,576 | 385,336 | 1 | 2004 | 0 | 0 |
| 2 | 2005 | 431,576 | 344,050 | 2 | 2005 | 0 | 0 |
| 3 | 2006 | 431,576 | 307,187 | 3 | 2006 | 0 | 0 |
| 4 | 2007 | 431,576 | 274,274 | 4 | 2007 | 357,413 | 227,142 |
| 5 | 2008 | 431,576 | 244,888 | 5 | 2008 | 357,413 | 202,806 |
| 6 | 2009 | 431,576 | 218,650 | 6 | 2009 | 357,413 | 181,077 |
| 7 | 2010 | 431,576 | 195,223 | 7 | 2010 | 357,413 | 161,675 |
| 8 | 2011 | 431,576 | 174,306 | 8 | 2011 | 357,413 | 144,353 |
| 9 | 2012 | 431,576 | 155,631 | 9 | 2012 | 393,154 | 141,775 |
| 10 | 2013 | 431,576 | 138,956 | 10 | 2013 | 393,154 | 126,585 |
| 11 | 2014 | 431,576 | 124,068 | 11 | 2014 | 393,154 | 113,022 |

Net Present Value: 2,562,568              Net Present Value: 1,298,436

Indicated Damages Arising From Difference in Rent: 1,264,132

6

## QUALIFICATIONS OF THE APPRAISER

*Arnold J. Grant, III, MAI*

Education:

B.S. with honors, Summa Cum Laude, University of Connecticut School of Business Administration. Major: Real Estate and Urban Economics Studies.
B.A. with honors, Summa Cum Laude, University of Connecticut College of Liberal Arts. Major: English.

Awards and Achievements:

University Scholar, 1973 - 1975. Highest undergraduate award conferred by the University of Connecticut. Graduated first in class of 2,000+.

Herbert U. Nelson Scholarship, presented by the National Association of Realtors, 1974 - 1975. Society of Real Estate Appraisers Undergraduate Scholarship, 1975. American Institute of Real Estate Appraisers Undergraduate Scholarship, 1974.

Professional Memberships:

MAI Member, Appraisal Institute.
Member, The Real Estate Exchange; Member of Executive Committee, 1995; 2005-2006.
Member, Board of Directors, Connecticut Chapter Appraisal Institute, 1992-1995.
Member, Board of Directors, Connecticut Appraisal Education Institute. 1996.

Appraisal Experience:

Real Estate Appraiser and Counselor. 1981-Present. Arnold J. Grant Associates, Inc., Hartford, Connecticut.

Real Estate Appraiser and Salesman. 1975 to 1980. Dow & Condon, Inc., Hartford, Connecticut. Research and writing of narrative appraisal reports, marketing and management of commercial and industrial properties.

Research Aide. 1973 - 1975. University of Connecticut Center for Real Estate and Urban Economic Studies. Research, compilation and writing of real estate studies, computer program writing.

Expert Witness: Connecticut Superior Court; Federal Bankruptcy Court.

State of Connecticut Certified General Appraiser, License #RCG.248; expires April 30, 2007.

# CERTIFICATE OF APPRAISAL REVIEW

I certify that, to the best of my knowledge and belief:

The facts and data reported by the review and used in the review process are true and correct.

The analyses, opinions, and conclusions in this review report are limited only by the assumptions and limiting conditions stated in this review report, and are my personal, unbiased professional analyses, opinions, and conclusions.

I have no present or prospective interest in the property that is the subject of this report and I have no personal interest or bias with respect to the parties involved.

My engagement in this assignment was not contingent upon developing or reporting predetermined results.

My compensation is not contingent on an action or event resulting from the analyses, opinions or conclusions in this review or from its use.

My analyses, opinions, and conclusions were developed, and this review report was prepared in conformity with the requirements of the Uniform Standards of Professional Appraisal Practice and the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

I made a personal inspection of the subject property during the review process.

No one provided significant professional assistance to the person signing this report. The opinions expressed in this report are my own.

As of the date of this report, Arnold Grant has completed the requirements of the continuing education program of the Appraisal Institute.

I certify that the use of this report is subject to the requirements of the Appraisal Institute related to review by its duly authorized representatives

Arnold J. Grant, III, MAI, President
Arnold J. Grant Associates, Inc.