UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHASE CROSSROADS WATERFORD | : | CIVIL ACTION NO. |
| SQUARE, LLC, | : | 3:03CV00432 (JCH) |
|       Plaintiff, | : | |
| V. | : | |
| | : | |
| THE MAY DEPARTMENT STORES | : | |
| COMPANY, | : | |
|       Defendant. | : | JULY 6, 2006 |

DEFENDANT THE MAY DEPARTMENT STORES COMPANY'S
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Introduction

In this case, plaintiff Chase Crossroads Waterford Square, LLC ("Chase") seeks to enforce a lease guaranty against defendant The May Department Stores Company ("May"). The guaranty agreement was entered into in 1983 by predecessors in interest of Chase and May, relating to a commercial lease of department store space by the former Caldor Corporation ("Caldor"). Caldor's lease of that space was guaranteed by its parent company, ADG; May is a successor in interest to ADG. May denies liability under the guaranty and maintains that any obligations it may have had under the guaranty were discharged by the plaintiff's actions.

In particular, May claims that: (1) there were various amendments to the lease to which May and its predecessor in interest, ADG, did not consent; (2) Chase failed to meet certain conditions of the lease which gave the tenant the right to terminate the lease at any time and the lease was in fact terminated by a successor to the original tenant, Ames Department Stores ("Ames"); (3) Chase released Caldor and its parent from any liability under the lease in connection with Ames's purchase of the lease through Caldor's bankruptcy proceedings; and (4) Chase burdened the leasehold and materially increased May's exposure without May's consent

by granting exclusive rights and uses to other tenants, thereby rendering the Caldor space

unmarketable or, at a minimum, materially decreasing its marketability to other tenants.  May

asserts that the foregoing actions discharged any liability under the guaranty before or

contemporaneously with Ames's rejection of the lease in its own bankruptcy proceedings and

that May, as successor in interest to ADG as guarantor, owes nothing.

Alternatively, May asserts that Chase terminated any future liability under the guaranty as

of early 2004, when it embarked upon a plan to substantially redevelop the entire shopping center

– a plan that included the complete demolition of the former Caldor premises.  At that time,

Chase declined to pursue replacement tenants for the Caldor building, including a proposed lease

with Burlington Coat Factory, that would have been a viable alternative and economic

replacement for the Caldor rent payments, but for conflicts with exclusive uses Chase had

granted to other tenants.

Chase thus embarked upon a venture that presented significant risks and significant

rewards, including the potential it has since realized to make the Chase Crossroads center a

"destination" shopping center that can demand retail rents at the top of the local market.  By so

doing, Chase substantially increased the present value and the long-term investment value of the

center, generated a rental stream that is, at a minimum, a complete replacement for the

Caldor/Ames rent, and made it impossible to "mitigate" its damages going forward in any legally

cognizable sense.

Both because it has obtained a replacement rent that exceeds the Caldor/Ames rent while

decreasing the landlord's expenses and because it undertook a new venture under which the

former Caldor building no longer exists and mitigation with respect to that leasehold is not

possible, Chase cannot claim damages from the point, early in 2004, when it determined to

pursue the long and risky process of redeveloping the center and pursuing a long-term ground

lease with Lowe's.

## Findings of Fact

I.    **Background Facts**

A.    **The Caldor Lease and Guaranty**

1.    In 1983, a predecessor to the present plaintiff leased retail space to Caldor as the

"anchor" tenant for a strip mall shopping center owned in Waterford, Connecticut.  Caldor's

parent company, ADG, guaranteed Caldor's lease obligations.

2.    Under the terms of the Caldor lease, the landlord agreed to put in place a first class

supermarket as a "key tenant" at the center.  The landlord agreed further that if the key tenant

was not put in place by a date certain, the tenant could, at any time thereafter, terminate the lease.

The date for putting the key tenant in place was extended by letter agreement several times, but

Chase did not comply with the key tenant provision, nor is there any evidence that this

requirement was affirmatively waived.  Even if there were such evidence of waiver by the tenant,

there is no evidence that the guarantor ever consented to such waiver.

3.    In the fall of 1986, the present defendant, May, merged with ADG.  May has

acknowledged that it is a successor to ADG for the purposes of whatever liabilities may exist

under the terms of the guaranty, but has asserted a number of defenses to the plaintiff's claims.

4.    The Caldor lease, as amended by the parties shortly after its execution, called for

rental payments in the amount of $471,135.00 in years 1 to 10 and $431,576.00 in years 11 to 25.

**(Ex. 208)**  The lease term commenced on March 7, 1988 and expires on January 31, 2014.  The

leasehold premises consisted of "a one-story building containing approximately eighty-nine

thousand seven hundred forty (89,740) square feet of ground floor area plus an unfinished

mezzanine of approximately two-thousand (2,000) square feet and a finished mezzanine not to exceed nine hundred sixty (960) square feet." **(Ex. 1, p. 2-1)** For purposes of calculating rent, the parties agreed to use a reduced square footage of 82,205 square feet. **(Ex. 269)**

5. The Caldor lease further provided that, except for the specific restrictions stated therein, "there shall be no restriction on the part of the Tenant to use the demised premises for any legally permitted purpose." **(Ex. 1, p. 6-1, ¶ 6 (B))**

**B.** **The Bob's Lease**

6. In April 1995, Chase leased the second largest space in the strip mall, approximately 50,000 square feet, to Bob's Stores. ("Bob's"). **(Ex. 210)** This lease created several issues relevant to the present dispute. First, the Bob's lease violated a provision of the Caldor lease by which the landlord agreed that it would not lease space in the center to another "department store" occupying 10,000 square feet or more. **(Ex. 1, p. 6-1)** Based upon the testimony and evidence presented at trial, the Court concludes that Bob's is a "department store" within the prohibitions of the Caldor lease. Second, by purporting to affect and limit the uses of other spaces at the center and by granting certain exclusive uses to Bob's, the landlord infringed the rights granted to Caldor under its lease to use the leasehold premises for "any legally permitted purpose" other than those purposes specifically prohibited by the Caldor lease terms. **(Id.)** Third, the Bob's lease purported to grant to Bob's exclusive uses that, along with exclusive uses granted to other tenants, burdened the Caldor leasehold and undermined any practical ability to place a substitute tenant in the former Caldor's space when that space became vacant, absent Bob's waiver of its rights under its lease. **(Id.; Ex. 210, Bob's Lease; Ex. 225, Lease Excerpts)**

7. Under the terms of the Bob's lease, the landlord agreed "not to use, lease, sell, or otherwise permit any space in the Shopping Center to be used, in whole or in part," for broad

categories of uses, including "(a) . . . any office or non-retail use . . . any professional center or professional offices . . any outdoor selling of merchandise . . . any retail warehouse, outlet distribution operation or similar type of operation . . .(b) hypermarket or other food market . . . a club store now commonly referred to as warehouse clubs, membership clubs, and/or wholesale clubs . . . a fitness center, health club, spa, exercise facility or gymnasium." **(Ex. 210, p. 22, § 8.03 (a) and (b))**

8. In addition, the landlord granted Bob's exclusive uses in a provision that permitted Bob's, if the exclusive use clause was violated, to pay a substantially reduced "Alternative Rent" "in addition to all other legal and equitable remedies." **(Ex. 210, p. 24)** The exclusive use clause barred any tenant at the shopping center other than Caldor from using more than:

    (a)    five thousand (5,000) square feet of sales and display area primarily for (i) the sale or display of casual and/or athletic apparel, or (ii) athletic footwear;

    (b)    one thousand (1,000) square feet of sales and display area primarily for the sale or display of jeans, denim pants, dungarees, or the like or casual pants or slacks;

    (c)    fifteen thousand (15,000) square feet of floor area for the sale and display of a combination of the following items, sporting goods and/or equipment, athletic apparel or athletic footwear (including by way of example but not limitation, the present retail operation operated under the trade names, Dick's, Sport's Authority and Modell's, respectively)

**(Id.)**

9. In addition to the Bob's exclusives and restrictions, Chase granted exclusive uses and restrictions to other tenants of the shopping center or the adjacent shopping center, including the following:

    (a)    Exclusive use to Hoyt's with respect to use as a movie theater or for stage shows **(Ex. 225, p. 2);**

    (b)    Exclusive use to BJ's with respect to operation as a wholesale club and limitations

prohibiting use of space by other tenants as a bowling alley, skating rink, dance

hall, amusement gallery of more than 5,000 square feet, pool room of more than

8,000 square feet, or health club of more than 8,000 square feet **(Id. at p.3)**;

(c)    Exclusive use to Odd Job with respect to use as a dollar or closeout store **(Id. at**
**p. 8)**; and

(d)    Exclusive use to Funco with respect to sale or rental of prerecorded entertainment
software **(Id. at p.9)**

10.  These exclusive uses and restrictions proved to have a substantial and direct

detrimental effect when first Caldor, and then Ames, failed to meet the leasehold obligations and

the landlord sought replacement tenants.

11.  The exclusive uses and restrictions also had a substantial directly corresponding

effect of increasing the risk facing a guarantor, such as ADG or May, that there would be a claim

of liability under the guaranty after the successive business failures of Caldor and Ames.  There

is no evidence that either Caldor, its parent, or May was asked to consent or gave their consent

either to the exclusive uses or restrictions granted to other tenants.

### C.  The Caldor Bankruptcy; the Assignment to Ames; the Ames Bankruptcy

12.  In September 1995, Caldor became a debtor in a Chapter 11 bankruptcy case.  By the

end of 1999, Caldor had entered into agreements, with bankruptcy court approval, to sell many of

its leasehold interests in Caldor department store sites, including the Chase Crossroads location.

13.  In April 1999, Caldor assigned all of its right, title, and interest in the Lease to Ames

Realty II, Inc., ("Ames II").  Chase accepted Ames II as a substitute tenant and Ames's parent

guaranteed its obligations to Chase under the lease.  **(Ex. 5; Ex. 267)**

14.  Chase continued to assert a claim in the bankruptcy court for certain sums it claims

were owed by Caldor.  In October 2000, Caldor and Chase entered into a letter agreement by

which Chase agreed to accept a payment from Caldor in satisfaction of its claims against Caldor

and all Caldor-related entities.  **(Ex. 221)** As stated in the letter agreement, Chase agreed that the

payment "constitutes full and complete resolution of all of its claims" and released "the Debtor

[Caldor] its parents, subsidiaries and affiliates and the directors, officers, attorneys, employees

and agents if each from all Claims."  **(Id.)**  May asserts that this agreement, by its express terms,

operated to release all claims against Caldor and its parents and affiliates and thereby discharged

any further obligations under the guaranty.

15.  In August 2001, Ames became a debtor in a Chapter 11 Bankruptcy case.  Ames

continued to operate at the Chase Crossroads location through early 2003.

16.  In February 2003, Chase was approached by a broker for Burlington Coat Factory

("Burlington Coat") with regard to Burlington Coat's interest in acquiring the Ames lease at

Chase Crossroads, with the suggestion that it would be advantageous to reach an agreement prior

to Ames rejecting the lease in its bankruptcy case.  **(Ex. 7, pp. 073-074)**

17.  Rather than pursue this inquiry directly, Chase forwarded the expression of interest to

May, suggesting that May purchase the Ames lease through the bankruptcy court.  **(Ex. 7, p. 071)**

The pretense articulated for Chase to decline pursuing a lease directly with Burlington Coat was

that Chase was "not inclined" to modify the existing lease as requested in Burlington Coat's lease

proposal.  **(Id.)**

18.  However, Ernest Porco, the Executive Vice President of Chase's real estate division,

has since admitted that Chase could not have proceeded with a Burlington Coat lease because the

exclusive uses it had granted in the Bob's lease absolutely precluded Chase from reletting the

Caldor premises to Burlington Coat.

19. May declined Chase's suggestion to purchase the Ames lease through the bankruptcy court on the basis that it would result in May becoming directly liable under the lease and would expand its potential liability by approximately 25 years, to the end of the lease terms under the proposed Burlington Coat sublease from May. **(Ex. 15)** Further, May did not agree that it would be immune, as sublessor to Burlington Coat, from a claim by Bob's that the sublease violated restrictions and exclusive use provisions in Bob's lease with Chase. **(Id.)**

20. Effective as of February 14, 2003, Ames rejected the lease at Chase Crossroads in bankruptcy court. **(Ex. 9)** Ames delivered the keys to the premises to Chase with a letter stating: "Your receipt of these keys completes delivery of possession of the premises to you." **(Ex. 217)**

### D. Negotiations with Burlington Coat and Lowe's Proceed on Parallel Tracks

21. In March 2003, Chase engaged Daniel Zelson of Charter Realty, Inc. as a broker to market the former Caldor premises. **(Ex. 12)**

22. In early 2003, soon after Zelson was engaged, he resumed the dialogue with representatives of Burlington Coat Factory with respect to taking over the former Caldor site. **(Ex. 228; Ex. 229)**

23. In the same time period, Zelson also fielded an expression of interest from Lowe's. He responded in April 2003, with a proposal to Lowe's for a dramatically different arrangement: demolition of the former Caldor's premises; a long-term ground lease; and an entirely new and larger facility to be constructed entirely at Lowe's expense. **(Ex. 233, Ex. 234, Ex. 240)**

24. In late August 2003, Zelson sent a facsimile to Burlington Coat's agent that stated: "There is a window to make a deal. Lowes [sic] is on hold for the moment." **(Ex. 251)**

25. At the end of September 2003, Zelson advised Burlington Coat's agent that Chase needed to know "if we are moving forward or not with BCF [Burlington Coat]," stating further

that "[w]e now have another deal for the space." Burlington Coat's agent responded with a further proposal. **(Ex. 222)**

26. In October 2003, Peter Brawley, Chase's Property Manager for the Chase Crossroads shopping center, executed a letter of intent tendered by Burlington Coat with some nominal changes which reflected that the parties were essentially $.25 per square foot apart with respect to the rental rate. **(Ex. 227)** The letter of intent included a typed comment inserted on the first page, in bold face letters, stating: **"See Bob's Restrictions." (Id.)** Burlington Coat's leasing agent advised Zelson that while he was continuing to look into the effect of the Bob's restrictions, "I do not believe that BCF [Burlington Coat] can live with it without some modification or approval from Bob's." **(Ex. 18, top e-mail)**

27. By December 2003, there was a short list of open items with respect to a Burlington Coat lease, none of which Brawley considered "unresolvable." **(Ex. 230)** Brawley directed Zelson to "arrange for a draft lease to be submitted." **(Id.)** Chase also pressed Burlington for a "[y]es or no" decision. **(Ex. 226, bottom e-mail)**

28. As of December 2003, Chase anticipated a decision within a matter of weeks from Lowe's real estate committee with respect to approval of the Chase Crossroads site for a Lowe's Home Center.

29. Brawley undertook to evaluate the financial terms of both the potential Burlington Coat deal and the potential Lowe's deal. He prepared several documents comparing the Caldor/Ames rent, the proposed Burlington Coat rent and the proposed Lowe's rent. In these comparisons, he used the Caldor/Ames net rent as a barometer to determine whether the cash flow of the proposed deals would constitute an economic replacement that would make the landlord whole. **(Ex. 232, Ex. 233, Ex. 239, Ex. 334)**

30. Brawley concluded from his analysis that if a lease had been concluded on the terms under discussion with Burlington Coat in late 2003 it <u>would</u> constitute essentially an economic replacement for the Caldor/Ames rent.   In contrast to the Lowe's transaction, which required demolition of the Caldor premises and a lengthy approval and construction process,  Burlington Coat was prepared to take over the premises in a matter of months, "as is," provided there were no roof leaks or defective mechanical systems.  **(Ex. 223, p. 2, ¶ 12)**

### E. <u>Chase Abandons Discussions With Burlington Coat and Proceeds With Lowe's</u>.

31. In early 2004, Lowe's Real Estate Committee approved the Chase Crossroads site for a Lowe's Home Center.  Chase greatly preferred the Lowe's transaction for a number of reasons, including the fact that it would dramatically change the tenor of the shopping center, making it a "destination" shopping center because of the presence of Lowe's.  In comparison with Burlington Coat, which would be one of numerous places to buy clothes, Chase viewed Lowe's as providing a unique draw that would benefit the shopping center and allow Chase to seek future rental rates for any vacancies in the shopping center satellite spaces at the top of the local retail market. Further, even though the Burlington Coat deal would essentially replace the Caldor/Ames rent, Chase concluded that the terms of the Lowe's deal were even more favorable.

32. Brawley prepared a spreadsheet comparing all three proposed transactions.  **(Ex. 232)** This document first adjusts the Caldor/Ames rent to reflect that the Caldor lease was not a true "net" lease.  Under the Caldor lease, the tenant was responsible to pay only the increases in common area maintenance ("CAM") charges, insurance and taxes after the first year of the lease, which is defined as the "Base Year."  **(Ex. 1, pp. 9-3, 10-1; Ex. 270; Ex. 271; Ex. 274)**  The total of the Base Year CAM, insurance and taxes was $71,204.  Thus, under the terms of the Caldor lease, the landlord was required to absorb the first $71,204 of these overhead items each

year.

33. Brawley's analysis accordingly reduced the annual gross base rent under the Caldor lease by $71,204, resulting in a reduction from the gross amount of $431,576.25 to what he refers to as the "True Ames NNN Base Rent" of $360,372.27. **(Ex. 232; Ex. 239)** Comparing this net rent with the Lowe's rent of $600,000 for the initial lease term, Brawley showed that the Lowe's rent was in excess of $100,000 per year more, even after subtracting the rent for rent lost from other tenants whose space would be affected or demolished to make room for Lowe's. **(Id.)**

34. Brawley also wrote extensive notes to Porco in the margins of the Lowe's proposal, explaining in some detail why he concluded "I think we should continue w/ Lowe's." **(Ex. 233)** His reasons include: (1) the rent loss from Caldor's and the other demolished stores would be more than "covered" in the Lowe's rent; (2) the Lowe's lease also would include "steps" or increases in rent for option terms; and (3) the "overall draw to the center [with Lowe's in place] should help rental rates of any new vacancies." **(Id.)**

35. Further, the lease proposal, drafted by Zelson in consultation with Brawley and Porco and sent to Lowe's, states directly that the costs of demolition and displacing tenants is incorporated in the Lowe's lease numbers. Thus, Zelson wrote in each iteration of his proposals to Lowe's:

> PLEASE NOTE – In order for the Landlord to do this deal he needs to knock down close to 100,000 square feet of retail space (the Ames [Caldor] and several other stores). He will have to cancel leases, relocate tenants at his expense and loose [sic] high rent space to accommodate Lowes. [sic] This is part of the reason that the economics are where they are in this proposal.

**(Ex. 234, Ex. 315)**

36. Based on the foregoing, it is clear that Chase considered the Lowe's deal preferable to Burlington Coat from the standpoint of cash flow and from the standpoint of the short-term

and long-term value of the shopping center.  It is further clear that the primary and singularly

effective obstacles to concluding a lease with Burlington Coat were: (a) the exclusive uses that

Chase granted to Bob's; and (b) the fact that Chase preferred the Lowe's deal, under which

Lowe's would enter into a long-term ground lease and construct a new building to house the

home center at Lowe's sole expense.

     37.  Chase concluded that it would proceed with Lowe's rather than Burlington Coat

despite the fact that there were increased risks, substantial delays and disruptions to other tenants

inherent in the Lowe's deal that were non-existent in the Burlington Coat deal.  These risks could

not have reasonably been contemplated by the parties at the time they executed the guaranty of

the Caldor lease, nor is there evidence that May agreed, as successor to the original guarantor, to

accept these risks.  The proposed Lowe's lease was, simply stated, a completely different

undertaking from the deal that ADG, May's predecessor in interest, had guaranteed.

     38.  From early 2004, for its own business reasons, Chase no longer pursued the

Burlington Coat  lease and concentrated exclusively on the Lowe's deal.  From no later than

February 1, 2004 forward, Chase gave no serious consideration to any resolution of the Caldor

lease claim that would involve retaining the structure of the former Caldor premises and leasing

that structure to a new tenant.  Moreover, the fact that the exclusive uses Chase had granted to

Bob's operated to preclude a Burlington Coat lease of the existing Caldor's premises was later

confirmed as Chase approached Bob's to amend its lease to accommodate Lowe's requirements.

In the course of those discussions, correspondence between Chase and a representative of TJX

(Bob's parent company) specifically identifies "Burlington Coat" as among "the types of stores

that Bob's does not want in the center."  **(Ex. 235)**

     39.  By March 2004, Chase entered into an agreement granting Lowe's access to the site

to conduct tests, surveys and examinations.  **(Ex. 236).**

40.  By August 2004, Chase had made a presentation to the Waterford Conservation
Board as part of the permitting process to demolish the former Caldor's building and construct
the new Lowe's facility.  **(Ex. 237)**

41.  On September 9, 2004, a story appeared in the <u>New London Day</u> under the headline
"Lowe's planning Waterford store."  The article reported that "Lowe's Home Improvement is
planning to demolish the former Ames [Caldor] department store next to Wal-Mart and build an
outlet at Exit 81 off Interstate 95."  **(Ex. 250)**  For the next nine months, the parties completed
the permitting and approval process, made arrangements with tenants who were to be relocated to
make room for Lowe's and negotiated the fine points of a definitive ground lease document and
related agreements.

42.  By May 2005, Chase signed a lease with Lowe's.  The structure of the Lowe's lease
is a long-term ground lease with an initial term of twenty years, far longer than the remaining
term of the Caldor's lease, and at a much higher annual rent.  For purposes of this case, the
parties have stipulated that the Lowe's lease itself will not be entered into evidence.  They have
agreed, however, that for purposes of calculating any damages owed to Chase, the Court may
assume that Chase will receive annual rent of $600,000 in years 1-5, $660,000 in years 5-10,
$726,000 in years 10-15 and $798,000 in  years 15-20.  May also has asked the Court to assume
that the ground lease includes six renewal terms of five years each, with the rent escalating on
each renewal, reaching $1.4 million per year in the final renewal term.

43.  Lowe's began paying rent under the ground lease in February 2006.  Under the terms
of the ground lease, Lowe's is responsible for the entire 11-acre ground lease site, including all
taxes, maintenance, structural repairs, and all other costs associated with the property.

44. Further, Lowe's also bore all of the expense associated with demolishing the former Caldor building and constructing its new facilities. The Lowe's building reverts to the landlord in the event the lease is terminated and at the expiration of the lease by lapse of time.

45. The improvements constructed by Lowe's include an enclosed, heated and air-conditioned building of approximately 136,000 square feet and a partially covered garden area of approximately 30,000 square feet. For purposes of sharing expenses in common with other tenants, Lowe's lease includes only the approximately 136,000 square feet of the enclosed Lowe's structure. In an appraisal recently obtained for purposes of refinancing the shopping center, a square footage of 136,665 was used as the "gross leasable area" of the Lowe's improvements, an approach concurred in by John Leary, an appraiser called by May as an expert witness. **(Ex. 200, p. 1)**

46. Chase's actions beginning in February 2004 in pursuing this lease agreement did not constitute mitigation efforts. From that point, Chase pursued a redevelopment of the center that involved a protracted and risky process of obtaining municipal approvals and construction of an entirely new building. Chase, of course, had the right t pursue this plan, which appears to have been clearly in Chase's short-term and long-term best interests as compared with the alternative of seeking a replacement tenant for the Caldor leasehold premises. However, Chase could not both pursue this plan and hold either the tenant or the guarantor liable under the terms of the Caldor lease.

47. Indeed, as Chase must concede, any number of factors might have proven insurmountable obstacles to concluding a Lowe's ground lease. If the plan had never borne fruit, surely it would not have been proper to continue to charge May, as guarantor, for the rent lost during the pursuit of a failed venture. Similarly, the lead time and expenses to conclude a

Page 14 of 41

successful transaction are not risks that would have been known and accepted by the guarantor at the time the guaranty was executed. The consequences of this course of action therefore are not properly chargeable to May as successor to the original guarantor and any liability under the Caldor lease or the guaranty for future rent or other charges ceased no later than February 2004, when Chase decided to embark upon this course.

## II. May's Position and Rebuttal to Chase's Damage Analysis

### A. May's Substantive Defenses Remain Viable

48. Prior to the Lowe's ground lease coming to fruition, May had asserted various defenses to Chase's claims. Among May's defenses was a claim that the landlord's actions in disregarding the key tenant provisions of the lease, in leasing 50,000 square feet to Bob's in violation of the prohibition of a lease to a department store of 10,000 square feet or more, and in granting exclusive uses to Bob's and other tenants, breached the landlord's duties under the lease, undermined the landlord's ability to re-let the premises, and discharged any guaranty obligation. May relies upon the settled principle that a guarantor's obligations are strictly construed and are discharged if the risks or burdens of the guarantor are increased without its consent. These defenses and others pleaded by May remain viable.

49. May also presented evidence that Chase and Caldor entered into a number of lease amendments and waivers of terms and provisions of the Caldor lease without seeking or receiving the consent of the guarantor. These amendments and waivers increased the potential risk and burden to the guarantor beyond that which a guarantor would have reasonably expected to assume at the time the guaranty was executed.

### B. Chase's Damage Analysis is Fundamentally Flawed.

50. Apart from its substantive defenses to Chase's claims, May maintains that any