damage claim is cut off as of the date in early 2004 when Chase no longer actively pursued mitigation by seeking a replacement tenant for the Caldor's premises. At that time, Chase decided, for its own short and long-term economic benefit, to pursue an agreement with Lowe's that required demolition of the former Caldor's premises. The Lowe's ground lease adds substantially to the long-term value of the center and provides higher rent and lower expenses to the landlord when compared with the Caldor's lease, even if the lost rent from other former tenants displaced by Lowe's is considered.

51. Chase nevertheless claims substantially more than $4 million in damages based upon a compilation of past due rent, tenant relocation costs, commissions, claimed future losses and a host of expenses it allocates to the Lowe' transaction, including such far-flung items as the legal services of Chase's in-house legal counsel, at a rate in excess of $200 per hour. While Chase assiduously allocates every conceivable cost associated with the redevelopment of the center as a "mitigation expense" and a deduction from Lowe's rent, however, Chase's damages analysis improperly credits May with only a portion of the projected Lowe's rents and ignores a host of benefits that accrued to Chase in the bargain.[1]

52. Chase limits the credit from the projected Lowe's rent to that portion of Lowe's rental payments attributable to 97,390 square feet, a fraction of the approximately 138,000 square feet of the Lowe's building and approximately 30,000 additional square feet of garden area. Chase calculates the 97,390 square feet for which it proposes to give May credit based on the area occupied by the former Caldor building, plus relocated smaller tenants, rather than the full Lowe's rent. Chase provides no support for this approach; and it derives no support either from

---

[1] In addition, after Ames rejected the lease in its bankruptcy and turned over the premises to Chase, Chase leased the premises to Wal-Mart for a short period for storage purposes. (**Ex. 263**) Chase's damages analysis also fails to credit the rent received from this tenant.

logic or the law.

53. Further, while allocating only a portion of the Lowe's rent as "mitigation" revenue, Chase calculates the Lowe's per square foot rental rate using the combined square footage of the entire Lowe's building and garden area. This approach has at least three obvious flaws.

    (a)    First, combining the square footage of the Lowe's building and garden area in calculating the per square foot lease rate conflicts with the "net leasable area" used in the recent appraisal of the property obtained by Chase's lender for refinancing purposes, with the "net leasable area" used by Leary, May's expert appraiser, and with the square footage used by Chase for purposes of allocating common expenses among Lowe's and the other center tenants. All of the foregoing use only the square footage of the fully-enclosed Lowe's building. By dividing the Lowe's rent by 168,000 square feet rather than by the approximately 136,000 square feet of the Lowe's building, Chase's damages analysis unfairly depresses the per square foot rate it uses when it allocates a portion of the Lowe's rent to "mitigation" of the lost Caldor rent.

    (b)    Second, combining the total square footage of both the garden area and the enclosed Lowe's building has the effect of further unfairly depressing the Lowe's per square foot rental used in Chase's damages analysis by blending rent paid for an enclosed building area with rent paid for unenclosed space that clearly would not command the same per square foot rental rate. Caldor had no garden area as a part of its leasehold and including this area in a comparison of rental rates distorts the comparison.

    (c)    Third, and most fundamentally, Lowe's does not lease either a building or a

garden area as such. Lowe's leases the ground beneath these areas as part of an eleven-acre parcel upon which it is privileged to erect structures of its own design and choosing. Chase makes a classic apples to oranges comparison when it attempts to equate the Lowe's ground rent with the Caldor's leasehold rent. If there is a way to make such a comparison fairly, Chase's damages analysis does not hit the mark. Rather, as discussed hereinafter, the line sensibly drawn by the courts is to consider a landlord's pursuit of a fundamentally different economic venture – noteworthy for among other reasons its requirement of a total demolition of a tenant's abandoned leasehold premises – as a cessation of mitigation efforts and acceptance of the tenant's surrender of the premises that terminates the landlord's right to seek recovery of future rent.

54. Chase asserts that there is factual support for its approach in that the physical footprint of the Lowe's facilities occupies a greater square footage of Chase's land at the center than did the former Caldor's premises. But this convenient and simplistic analysis overlooks the previously noted benefits bestowed on Chase from the replacement of Caldor's with Lowe's, as well as the following facts:

    (a)    Lowe's uses the garden area, just as it uses parking facilities, rights of way and loading docks, in its business. This fact does not render the garden area as leased space that may be fairly compared to the enclosed Caldor building area. Chase's analysis misses the obvious fact that Lowe's could not be present on the site but for the demolition and removal of the Caldor's building. On this basic level, the entire Lowe's building is a replacement for the Caldor's building.

    (b)    Further, in assessing the impact on the Chase Crossroads site based on the

Page 18 of 41

footprint of the Lowe's physical structure and garden area as compared with the footprint of Caldor's, Chase overlooks other direct advantages, in terms of site usage, that accrued as a result of the Lowe's project:

(i) In obtaining approval for the Lowe's site, Chase was able to convince the Waterford zoning officials to depart from the standard rule of 5 parking spaces per 1,000 square foot of retail space. Chase prevailed in its position that a home center use imposes significantly lower parking burdens and obtained approval for the Lowe's building based on 2.2 parking spaces per square foot.[2] (**Ex. 200, p. 18; Ex. 328, Special Permit Findings, p. 3, "Section 20 Compliance"; Ex. 23, Site Plan, "Zoning Information"**) Chase also succeeded in obtaining a reduction in the parking requirements for the retail stores in the remainder of the center from the standard of 5 spaces per 1,000 square feet to 4 spaces per 1,000 square feet. Thus, Chase was able to fit Lowe's greater building size on the site because its parking requirements, were lower per square foot. As a consequence, Chase was able to accept a lower per square foot

---

[2] At 82,000 square feet, Caldor's parking requirements would be 410 spaces at the normal standard requirement of 5 spaces per 1,000 square feet. In contrast, Lowe's parking requirements, even including the garden area square footage in the calculation, is less than 400 spaces. And the variance that Chase obtained for the remaining retail spaces saved almost 100 additional spaces. The net result is that even with the much larger Lowe's building, there is a provision in the Covenants and Restrictions agreed to between Chase and Lowe's that permits Lowe's to expand its building in the future by taking up to 40 spaces of the parking area. (**Ex. 330, p. 14, § 5.5**). Thus, rather than imposing a higher burden on the center, the Lowe's use imposes reduced total space required by its building, garden area and parking.

            rental while at the same time greatly increasing its rent receipts and reducing the parking burden at the site. The net result is a higher total receipts with a reduced cost structure and lower overall burden on the center. As such, the entire Lowe's rent is properly considered as a replacement for the lost Caldor rent.

(ii)    In addition, when Chase received approval for the redevelopment of the center to include a Lowe's Home Center, Chase also was granted substantial variances from the normal road setback requirements imposed by the Waterford zoning regulations to accommodate the larger Lowe's structure. Chase received permission to reduce the setback along Waterford Parkway North from 150' to 28.9' and to reduce the setback from Foster Road from 75' to 52'. These setback variances added approximately 90,000 square feet of usable land area to the site, more than making up for the difference in the footprint between the Lowe's and Caldor's structures. Thus, as with the tenant's parking burdens, Chase realized a net benefit with respect to the Lowe's tenancy as compared to the situation when the Caldor building remained standing.

55. Even if the Court were to attempt a "mitigation" analysis beyond the point that Chase decided to pursue the Lowe's ground lease, much of what Chase claims as offsets to the higher Lowe's rent are not properly chargeable to the guarantor of the Caldor lease. For example, in order to accommodate the size of the Lowe's structure, Chase chose to relocate several tenants

within the center and move several tenants out of the center. Again, these are facts that were not known or knowable at the time the guaranty was executed and represent risks not within the normal contemplation of a guarantor of a lease such as the Caldor lease.

56. Further, it is not reasonable to take such negative factors into account without also considering a host of positive effects that Chase's damages analysis does not consider. Chase's analysis fails to take into account the immediate and long-term increase in the investment value of the center as a result of the redevelopment process. Chase's analysis also fails to account for factors such as the value and extended useful life of the new Lowe's building, which replaced a nearly twenty-year-old Caldor building at no cost to Chase. Chase similarly fails to account for the fact that it has no responsibility for any costs associated with the ground leased premises, including structural repairs that normally would be a landlord's responsibility. Chase ignores the lower risk of a long-term ground lease, because of the financial strength of the tenant and its long-term commitment to and investment in the leasehold property.

57. In addition, the Lowe's rental rate in the first lease term necessarily is lowered by the investment that Lowe's made in the substantial costs of demolishing the former Caldor's premises and building the new Lowe's facilities. The fact that all of these expenses were borne by Lowe's necessarily means that they have been amortized into the rental rate paid by Lowe's. A replacement tenant for the Caldor building, such as Burlington Coat, would not have incurred such expenses. By proceeding with a ground lease arrangement under which Lowe's was responsible to construct a new building and to reimburse Chase's demolition expenses, Chase has received the financial benefit of these improvements. By comparing the Caldor rent to the Lowe's rent without adjusting for this factor, Chase essentially would hold May responsible for demolition and construction costs borne by Lowe's that have been amortized into Lowe's rental

Page 21 of 41

rate.

58. Further, in order to make a true comparison of the Lowe's lease rental stream and the Caldor rental stream, the annual "base year" expenses borne by the landlord and the costs associated with the landlord's other obligations under the Caldor lease must be taken into account. However, Chase accounts for this difference only by comparing its collections of insurance, CAM and taxes under the present agreements with Lowe's and other tenants with the collections it anticipated under the Caldor lease and prior configuration of the center. Because collection of these overhead items is intended only to reimburse the landlord, rather than to generate any profit, however, Chase's analysis of this issue is fundamentally flawed and is at odds with its own internal business analysis of the same issue.

59. A more accurate comparison is reflected in the business analysis of Chase's property manager, Brawley, prepared for the business purpose of deciding whether to pursue the Lowe's ground lease or the Burlington Coat lease. Under Brawley's analysis for business purposes, as contrasted with the litigation-oriented analysis Chase has presented to the Court, the entirety of the Lowe's lease revenue is compared with the Caldor rent reduced by the Base Year CAM, taxes and insurance absorbed by the landlord. The result, as Brawley indicates, is a comparison of the "true" net rents. Under this analysis, the net benefit to Chase is more than $100,000 per year even after Brawley subtracts the rent lost from other space demolished to make room for Lowe's.

60. Even this comparison is imperfect, however, because it fails to take into account the additional expenses that Chase avoids altogether because Lowe's is responsible for all expenses associated with the ground leased area and its improvements. Chase has not presented any evidence to establish the costs of the landlord's obligations under the Caldor lease that do not exist under the Lowe's lease, making a true comparison and calculation of its "damages"

Page 22 of 41

impossible without resort to speculation. Chase's analysis of the lost rent from demolished spaces also arbitrarily assumes a lease rate of $14 per foot when the actual rent paid by the displaced tenants was substantially lower. Chase's analysis of these losses also assumes perpetual lease terms and fails to account for vacancies, collection losses, and unreimbursed landlord expenses associated with the lost rental spaces.

61. A true comparison of the economic effects of Chase's decision to go forward with a Lowe's ground lease would be an extremely difficult undertaking. Even if it could be done in a reliable manner, it would not be an analysis of Chase's mitigation in any legally recognizable sense, but of the effects of its business decision to accept a surrender of the Caldor leasehold in order to pursue a new and vastly different economic venture. As such, the analysis would be irrelevant to a determination of damages Chase may recover under a guaranty of the Caldor leasehold obligations.

62. Chase's damages analysis is further irrelevant to a determination of the damages recoverable in this case because, despite its flaws and incompleteness, Chase's own analysis shows that the rent collected from Lowe's and the expenses it avoids under the Lowe's ground lease result in a substantial net economic benefit to Chase when compared with the lost net revenue from the Caldor lease. This is true even if Chase is permitted to subtract the rent lost from other tenants displaced by the Lowe's structure. If Chase's claim to a broad panoply of remote and legally unrecoverable "mitigation expenses" is disallowed, therefore, Chase has no recoverable damages other than back rent for a period prior to Lowe's occupancy, even under Chase's own damages analysis.

63. In sum, Chase's "mitigation" analysis begins at an illogical place and ends with a claim that is an absurdity. Chase starts by assuming rent is due from a defunct second-tier

retailer in a non-existent building that was more than twenty years old when it met the wrecking ball. It ends by comparing that non-existent leasehold with a new long term ground lease with a first-class tenant, under which the tenant bore all of the expense of demolishing the old leasehold premises and erecting a new structure, and bears all of the going-forward expenses associated with the building and eleven acres of real estate. Such a comparison cannot properly be considered a "mitigation" analysis in any reasonable sense of the term. It incorporates so many inapt and incomplete comparisons as to result in an outcome that is speculative at best and would hold a guarantor of the Caldor lease to a bargain that it never made. Even if one were to consider a mitigation analysis proper and feasible on the present facts, Chase's damages analysis fails to properly account for numerous factors that must be considered in order to make a fair comparison. Chief among these are:

- Chase's failure to give full credit for the rent collected from Lowe's;

- Chase's failure to properly account for the reduction in the expense it bears as landlord under the ground lease with Lowe's;

- Chase's failure to consider the fact that the expense borne by Lowe's in the demolition of the Caldor's premises and construction of the new facilities must be amortized in some fashion into the rental rate;

- Chase's failure to consider the appreciation in the present value of the shopping center and its long-term investment value as a result of the reconstruction of the center;

Page 24 of 41

- o   Chase's failure to consider the increased rental value of the remaining retail space;

- o   Chase's failure to consider the benefits of the parking and setback variances it obtained as a consequence of the Lowe's redevelopment project;

- o   Chase's inclusion of the garden area as part of the net rentable area, thereby unfairly depressing the per square foot rental figure it uses to compare the Lowe's rent with the former Calder's rent

- o   Chase's calculation of the roughly two-year period from the time that it determined to proceed with a Lowe's transaction to the time it began collecting rent from Lowe's as a "dark" period in which the full amount of the Calder's rent is due from May as successor guarantor.

64. Chase considered and balanced reasonable business and economic factors in its internal non-litigation analysis of the economics of the Lowe's transaction, as well as in negotiating the rental rate and other terms of the Lowe's lease. Chase cannot reasonably be permitted to ignore these same factors in calculating the damages it claims from May in this case. In the end, consideration of these factors in a manner that is consistent with Chase's own non-litigation analysis leads inescapably to the conclusion that the Lowe's development was at the very least an economic replacement for the Calder's rent and that it brought many other benefits to Chase that supported the business decision to proceed with the development. The very notion that Chase would have proceeded with a Lowe's development if the net effect was in excess of

$4 million in net harm, as it claims in this case, defies both the financial analysis of Chase's own representatives and factual realities obvious from the evidence.

65. As a factual matter, Chase's claim of damages is unsupportable from the time that it decided to proceed with a Lowe's deal that enhanced its present rent receipts, required destruction of the Calder's premises, substituted a long-term ground lease with an annual rent of $1.4 million in the last renewal term, and shifted all maintenance obligations for the entire 11-plus acres and all improvements to the tenant.

66. The unsupportable nature of Chase's claim is further illustrated by the fact that the gross rent obligation under the Caldor lease through 2014 <u>on an undiscounted basis</u>, is approximately $4.8 million, a sum approximately the same as Chase's damages claim. Thus, if May were to have paid all of the rent due under the Caldor lease to its termination, the net cost in present day dollars would be less than Chase's claim in this case. Plainly, whatever else Chase's course of conduct may represent, it was not "mitigation" of damages.

### III. <u>Legal Analysis</u>

#### A. Liability of a Lease Guarantor is Fixed at the Time of Execution and Can In No Event Exceed the Liability of the Tenant to the Landlord.

67. The claims and defenses in this diversity case involving a lease guaranty are governed by Connecticut law, except to the limited extent that the factual background of the case raises issues of federal bankruptcy law.

68. Underlying any analysis of May's potential liability in this case is the principle that the guaranty agreement determines the scope of a guarantor's liability. The extent of the liability of the guarantor of a lease "is to be measured by the language of the lease and of the guaranty." <u>Murphy v. Schwaner</u>, 84 Conn. 420, 425 (1911); <u>Finnucan v. Feigenspan</u>, 81 Conn. 378, 381

(1908) ("The language used will not be extended by any strained construction for the purpose of enlarging the guarantors' liability.")

69. Because the scope of the obligations created by the guaranty are defined by reference to the obligations of Caldor as tenant under its lease with Chase, May's liability can be no greater than that of the tenant. At worst, therefore, May stands in the shoes of the tenant under the lease. While May's liability is not necessarily discharged as a direct result of the Caldor bankruptcy, in all other respects, May's liability can be no greater than that of Caldor, the party whose lease obligations May's predecessor in interest guaranteed.

70. Further, the liability of a guarantor is strictly construed and limited to risks that it would be reasonable to assume might arise at the time the guaranty was executed. These risks cannot be expanded by subsequent events without the guarantor's express consent. In Williamson, Ltd. v. Perry, 111 Conn. 317, 323 (1930), a case involving a guaranty of a contract of sale, the Court approved as a correct statement of the law the following jury instruction:

> The law requires diligence and good faith on the part of anyone who relies on a guaranty. A guaranty can only be enforced if the terms of the contract guaranteed are strictly complied with. The extent of the defendant's liability is to be measured by the language of the contract of sale and of the guaranty and any material change, without her consent, in the terms of the contract she guaranteed would effect her discharge. If the defendant guaranteed to pay for goods sold under a specific contract, of course she can only be held for the amount of goods sold under that contract and in accordance with the terms thereof. She is not held for anything except those things she agreed to be held for.

71. To recognize Chase's claims in the present case would stand this accepted construction of a guarantor's strict, narrow and limited liability on its head. Chase's damage claim would hold May responsible for a myriad of risks, agreements and transactions related to redeveloping its shopping center, including negotiation of an entirely new and different lease arrangement, municipal approvals, a major construction project, relocation of displaced tenants,

refitting of satellite tenants' space, tenant moving expenses, construction costs, design fees, buyout fees, legal fees and a host of other items detailed in reams of invoices and spreadsheets that Chase force-fits under the rubric of "mitigation-related costs." **(Ex. 321-326)** These claims conflict with the settled rules of strict construction of a contract of guaranty, the bar against extension of the guarantor's liability beyond that which he agreed to be liable for, the limitation of a guarantor's liability to future consequences and events that were reasonably foreseeable at the time he entered into the guaranty, and the limitation of a guarantor's responsibility to costs and losses directly related to a breach of the obligations guaranteed.

72. Under the law properly applied, if Caldor would have a defense to payment under the lease – as it clearly would based on Chase's decision to demolish the leasehold premises and embark on a new and entirely different economic venture with Lowe's – then May as successor guarantor has the full benefit of the same defense. See Tartsinis v. Porter No. CV 02-0078127 (Super. Ct. Judicial District of Tolland, May 1, 2003) (liability of lease guarantors is coextensive with the term provided for in the lease) (Attached at Tab A); Merchants Nat'l Bank v. Stone, 296 Mass. 243, 251 (1936). (A guarantor's obligations "are coextensive with those of the principal obligor."); Cont'l Nat'l Bank v. Dolan, 39 Colo. App. 16, 564 P.2d 955 (1977) ("Unless expressly agreed otherwise, a guarantor's liability is generally coextensive with that of the principal.") Because Caldor clearly would have no obligation to pay rent for premises that no longer exist, or for far-flung costs of an entirely new venture, May has no liability as guarantor, aside from potential back rent liability up to the point that Chase determined to pursue the Lowe's venture.

73. The evidence also establishes that Chase accepted Ames as a substitute tenant and released Caldor and its parent from any further claims in connection with Calder's bankruptcy case. **(Ex. 221)** While Chase maintains that this release did not apply to all claims against

Page 28 of 41

Caldor and its parent, the plain terms of the release agreement state otherwise. See <u>Gould v. Mellick & Sexton</u>, 263 Conn. 140, 151 (2003) ("words do not become ambiguous simply because lawyers or laymen contend for different meanings.")

74. The evidence also establishes that Chase and Caldor entered into a number of material lease amendments and waivers of lease terms without the consent of the guarantor, thereby discharging any further obligations under the guaranty. <u>Murphy</u>, 84 Conn. at 425 ("any material change" in the terms of a lease without the consent of a guarantor, "would effect his discharge"); 49 Am. Jur. 2d <u>Landlord and Tenant</u> §822 (1995) ("A material alteration or departure from the contract of guaranty or lease, without the guarantor's consent, will discharge the guarantor, whether or not the guarantor is prejudiced thereby.")

75. In addition, the landlord's actions in this case satisfy the legal elements of "surrender and acceptance," in that the landlord decided to pursue a major redevelopment of the center that included demolition of the Caldor building, an action obviously and fundamentally inconsistent with any future occupancy of the leasehold premises. <u>New Market Acquisitions, Ltd. v. Powerhouse Gym</u>, 212 F. Supp.2d 763, 772 (S.D. Ohio 2002) (landlord's decision to enter into a lease with new tenant for substantially greater area, at a higher rent, and its agreement to substantially renovate premises cut off claim for future rental losses); <u>Gotlieb v. Taco Bell Corp.</u>, 871 F. Supp. 147, 152 (E.D.N.Y. 1994) (extensive renovations, entering into a leasehold for a term substantially beyond that of the defaulted lease and other conduct similar conduct "indicates] the landlord's intent to terminate the lease and use the premises for his own benefit.")

### B. **Chase Failed to Properly Mitigate its Damages**.

#### 1. **The Duty to Mitigate**

76. If any liability remained under the guaranty after the point that Ames rejected the

lease in its bankruptcy case, Chase was required to take reasonable actions to mitigate its damages. The parties agree that applicable Connecticut law imposes a duty of mitigation. See Rokalor, Inc. v. Connecticut Eating Enterprises, Inc., 18 Conn. App. 384, 389 (1989); see Conn. Gen. Stat. §47a-11c.[3]

77. In addition, in this case the lease speaks directly to the issue of mitigation. Under the express terms of the lease, the landlord agrees "to use reasonable efforts" to relet the premises after a default by the tenant. **(Ex. 1, p. 21-1, ¶ 21(B))**

### 2. Chase Failed to Mitigate When it Refused to Proceed With the Burlington Coat Lease and Sought to Impose a Direct Landlord-Tenant Relationship on May.

78. The evidence shows that Chase had the opportunity to enter into a lease agreement with Burlington Coat prior to incurring any significant losses of rent or other damages. Chase chose not to proceed, purportedly because it did not wish to "modify the lease." In reality, Chase knew that its own actions in granting conflicting exclusive uses to Bob's precluded entering into a lease with Burlington Coat. Chase seeks to avoid the consequences of its actions by suggesting that May had the duty to enter into a direct lease with Chase and a sublease with Burlington Coat that would not be subject to the exclusive uses of the Bob's lease. May's legal obligations, to the extent any remained, were defined strictly by the terms of the guaranty agreement and did not include the duty to enter into a direct landlord-tenant relationship, let alone the duty to participate

---

[3] **Sec. 47a-11c. Breach of rental agreement by tenant. Measure of damages.**

If a landlord terminates a residential or commercial tenancy on the grounds that the tenant committed a breach of the rental agreement and the landlord brings an action for damages for the breach, such damages shall include the amount of rent agreed to by the parties but unpaid by the tenant. The landlord shall be obligated to mitigate damages. This section shall not limit either party's rights to assert other legal or equitable claims, counterclaims, defenses or set-offs.