in the kind of subterfuge suggested by Chase.

79. Further, Chase's theory that May could circumvent the Bob's exclusive uses and restrictions by subleasing to Burlington Coat is fundamentally flawed. By their express terms, the Bob's restrictions applied to all tenants at the shopping center except for Caldor. **(Ex. 210, p. 24)** In any ensuing litigation, the well-documented "conspiracy" between Chase and May to subvert the Bob's exclusives undoubtedly would have come to light, leaving May in a very undesirable position. Chase's suggestion that May acquire the lease through the Ames bankruptcy and lease directly to Burlington Coat thus was little more than an unwise invitation to a lawsuit that May properly and prudently declined.

80. The Bob's exclusives and restrictions posed a dilemma created by Chase that did not limit or excuse Chase's duty to mitigate its damages. Chase's refusal to enter into a lease with Burlington Coat was inconsistent with its obligation to take reasonable steps to mitigate its damages. "[I]n assessing the reasonableness of the landlord's efforts to mitigate damages the trier may consider whether the landlord was justified in refusing to rent the demised premises to a prospective tenant who was otherwise satisfactory and who could have put him in at least as good a position as if the original contract had been fully performed." Danpar Assoc. v. Somersville Mills Sales Room, 182 Conn. 444, 446 (1980) (refusing recovery to landlord because of a failure to take reasonable steps to mitigate damages.)

81. In Kallman v. Tandy Corp., Case No. 99 C 490 (Canaille, J., January 16, 2001) (N.D.Ill. 2001) (Attached at Tab B) Color Tile, as tenant, entered into a lease of a building zoned for commercial use. Id. at 1 The lease was guaranteed by Tandy Corporation, now known as Radio Shack. Id. Color Tile filed for Chapter 11 Reorganization and vacated its portion of the property in February 1996. Id. at 2 The landlord sought recovery for unpaid rent, taxes,

insurance less the amounts collected from replacement tenants, expenses of reletting the property, which included broker's commissions and attorney's fees, and the amounts paid for repair of damaged portions of the premises. Id. at 3  The Court concluded that in marketing the premises the landlord's representative was "less concerned with reletting the property for the remainder of the Color Tile lease term than he was with maximizing [the landlord's] return over the long haul." Id. at 5  As a result, the Court held that the landlord did not take reasonable measures to mitigate damages. Id.  The court stated that "[w]hat might be reasonable for a landlord that is eating its own losses is not necessarily reasonable when it is able to shift its losses to a third party." Id. at 8  The court also refused recovery for repair costs incurred for the purpose of securing a long-term tenant. Id.

82. Chase's decision to grant exclusive uses and restrictions to Bob's, as well as its decision to pursue an agreement with Lowe's that required demolition of the Caldor leasehold premises in order to maximize Chase's own long-term benefit similarly was inconsistent with its duty to mitigate. The latter decision also operated as an acceptance of surrender of the premises and terminated any claim for future damages.

### 3. Chase Cut Off its Claim for Damages By Pursuing the Lowe's Ground Lease.

83. Termination by surrender or repudiation may be affected by either express agreement or by operation of law, where it is inferred from the conduct of the parties. Gotlieb, 871 F. Supp. at 152.

> Acceptance of a surrender is created by operation of law when the parties to a lease do some act so inconsistent with the landlord-tenant relationship which implies their intent to deem the lease terminated. . . . Such an implied acceptance of surrender has been found in conduct by the landlord which fell short of an actual re-letting but which indicated the landlord's intent to terminate the lease and use the premises for his own benefit.

Id. (citations omitted; internal quotation marks omitted.) "Mere attempts to re-let are insufficient to establish an acceptance by operation of law." Id. at 153. However, executing a new lease with a third party for a period that extends far beyond the lease with the breaching tenant and at a rate that is much higher establishes an acceptance of surrender of the original lease, rather than an attempt to mitigate damages. Id. at 152.

84. Rebuilding or major remodeling of the premises also results in the termination of the lease by operation of law:

> While the landlord is permitted to secure the premises, clean the premises, and, at least to some extent, renovate the premises in order to rent it on behalf of the existing tenant, the landlord cannot go too far in the remodeling without running the risk that the lease will be terminated. . . . <u>[A] landlord would be deemed to have accepted the surrender of leased premises if the property was remodeled to such an extent that it was no longer usable for the purpose for which the property was leased, unless the lease expressly stated that such action would not constitute acceptance of the surrender. . . . [E]xtensive repairs or improvements not necessary for the preservation of the premises will usually be construed as an acceptance of a surrender.</u>

Similarly, a landlord cannot sell abandoned leasehold premises and reserve the right to claim damages for the balance of the lease. First Wis. Trust Co. v. L. Wiemann Co., 93 Wis.2d 258, 274, 286 N.W.2d 360 (1980) ("The fact that the plaintiffs reserved the right to sue the defendant for breach of the lease and hold it liable for rent for the balance of the lease term is inconsistent with the sale of the property.")

85. A long-term ground lease is the functional equivalent of a sale of property. "Indeed, the ground lease has traditionally been used to acquire the functional equivalent of fee simple ownership of property." Thompson on Real Property § 44.13(a) at 482, 483 n. 218 (David A. Thomas ed., 1994). "It should be understood that the lessor under a long-term, net ground lease has effectively given up real estate investment in return for what essentially is a fixed-return

investment, comparable to a bond" Id.; see Lake End Corp. v. Township of Rockaway, 185 N.J. Super. 248, 448 A.2d 475, 480 (1982) (99 year lease conveys ownership equivalent to fee simple); Jennings v. Connecticut Gen. Life Ins. Co., 177 So.2d 66 (Fla. App. 2 Dist. 1965) ("The lessor's interest in a long term ground lease is more akin to that of a mortgagee than of an ordinary fee simple owner.")

86. Here, the lease between Chase and Lowe's has many of the features that are considered the functional equivalent of fee ownership, including a potential term of fifty years, the lease of an unimproved piece of land with a duty to construct a building, and the absence of a duty on the part of the tenant to maintain the operation of a business at the premises.

87. While there are distinctions between full ownership in fee and a long term ground lease, there are more significant distinctions between a lease of improved premises, such as the Caldor lease in this case, and a long term ground lease under which the tenant bears the cost of constructing improvements. The Caldor lease and the Lowe's ground lease constituted fundamentally different economic investments that cannot reasonably be compared with one another by the kind of simplistic addition and subtraction of revenues and expenses reflected in Chase's damages analysis.

88. It is apparent that the net "loss" of $4.6 million dollars Chase claims in this case is artificial and fails to take into account many of the significant economic realities of the relationships that it purports to compare. It fails to arrive at a "net" benefit or detriment to the landlord that fairly accounts for all of the significant variables or permits the Court to calculate damages in a manner that rises above the level of speculation. Even if such an analysis is theoretically possible, it fails on the present record because Chase's analysis does not consider all of the relevant economic factors and it includes risks of an entirely different economic venture

from those which the guarantor of Calder's lease agreed to be held accountable.

89. A claim for actual direct damages should seek to compensate the landlord by placing him in the same position as he would have been if the tenant fully performed under the contract, taking into account the duty to mitigate damages. 3 The Commercial Property Lease 285 (American Bar Association, Patrick A. Randolph, Jr. 2000 ed., 2000). However, the damages have to be reasonably contemplated by the parties upon entering into the contract in order to recover those damages when there is a breach of the lease agreement. See Evans, Inc. v. Tiffany & Co., 416 F. Supp. 224, 242 (N.D. Ill. 1976); see also, Gruenberger, Determining and Proving Damages 14-17 (Law Journal Seminars-Press, Inc., 1978).

90. Consequential damages can only be recovered if the damage resulting from the breach is "natural and probable." The plaintiff will not recover consequential damages if the plaintiff's damage, or any item thereof, "is separated from the defendant's wrongful act by an independent, efficient cause which breaks the causal connection; or, according to most cases -- especially if the action is based upon negligence or contract -- if it is not a natural [normal] and probable result." Bauer, Essentials of the Law of Damages 18 (Callahan and Co. 1919). Consequential damages will not be recoverable if the damage is not a proximate result of the breach. If there exists an intervening cause, proximate cause will not exist. "The simplest and clearest case of independent, efficient intervening cause is the wholly voluntary act of the plaintiff . . . not rendered necessary or likely by the defendant's wrongful act." Id. at 29.

91. As a matter of law, a decision to demolish leasehold premises is fundamentally at odds with the right to continue to claim rent under a lease from the tenant, or from a guarantor of the tenant's obligations. A landlord cannot continue to hold a tenant who has abandoned the lease premises (or a guarantor of the lease) responsible for the rent under the lease after the

landlord has accepted surrender or ceased mitigation efforts by taking acts inconsistent with preserving the leasehold premises.

92. In the New Market case, after the tenant abandoned the leasehold premises the landlord entered into a lease with California Fitness for an area approximately twice the size of the former tenant's premises. Significantly, New Market did not even make a claim for future rental losses.

93. Rather, New Market and the Court readily recognized a fundamental point which Chase refuses to accept in this case – that where the landlord entered into a lease with a new tenant for more space that generated more rent, "liability for future rent was cut off when the [new] Lease became effective." Id. at 772

94. New Market did claim damages in the form of back rent, incentive payments, an equipment allowance, brokerage commissions, costs of renovations and costs incurred in the relocation of an existing tenant. The court held that the defendants were not liable for construction costs or the incentive payments and equipment allowance provided to California Fitness because they were not reasonable or foreseeable. Id. at 769-771. This holding is consistent with the conclusion reached in other similar cases. For example, in the case of In re Child World, Inc., 161 B.R. 349 (Bankr. S.D.N.Y. 1993), the Court held an incentive payment made to induce a tenant to take over a leasehold at a higher rental value than the rent due under the debtor's lease was "not one of the direct consequences of mitigating a landlord's damages" and was "too remote and unforeseeable" to be charged to the debtor. Id. at 353. The Court stated further that the landlord suffered no "loss in rental value" because it relet the premises for a higher lease amount. Id. at 352.

95. As the New Market court stated: "Numerous courts have held that major structural

changes . . . are not recoverable as mitigation damages." Id. at 776. There are, in fact, numerous cases that bar recovery where a landlord has extensively remodeled or demolished the leasehold premises or taken actions that increase a guarantor's risk without the guarantor's consent. See, e.g., C.D. Stimson v. Porter, 195 F.2d 410, 414 (10th Cir. 1952) ("substantial and permanent" changes redounding to the benefit of the lessor not recoverable as mitigation expenses); In McIntyre Square Assoc. v. Evans, 827 A.2d 446 (Pa. Super. 2003) (guarantor excused from liability on an extended lease term that increased his risk under the guaranty); In re Andover Togs, Inc., 231 B.R. 521, 537 (Bankr. S.D.N.Y. 1999) (long-term capital improvements which "yield a betterment to the leasehold," may not be included in a computation of damages for breach of lease); Penn Palace Operating, Inc. v. Two Penn Plaza Assoc., 657 N.Y.S.2d 41 (App. Div. 1997) (guarantor excused when landlord and tenant agreed upon a 16-year extension without the guarantor's consent); In re Preview-Gem, Inc., 465 F. Supp. 629, 638 (W.D. Mo. 1979) (lessor not entitled to recover mitigation expenses incurred in making long-term capital improvements since those expenditures ultimately benefitted lessor); In re Stewart's Properties, Inc., 41 B.R. 353, 356 (Bkrtcy. D. Hawaii 1984) (lessors not entitled to recover expenses for long-term capital improvements that ultimately benefitted themselves); Pioneer Trust & Savings Bank v. Zonta, 96 Ill. App.3d 339, 421 N.E.2d 239, 245 (1981) (money spent on remodeling was not recoverable because it "constituted a capital improvement which would increase the value of the premises"); Dana-Comp Corp. v. Selig Enters., Inc., 143 Ga. App. 462, 238 S.E.2d 571 (1977) (upholding the need for the guarantor's consent to future modifications in the form of a 600 square foot enlargement of the premises and a rent increase).

96. The New Market court further stated that "[w]hile it may be reasonable to hold Defendants liable for those expenses necessary to restore 14,866 square feet to its former state,

the Court refuses to find that they are liable for twice the square footage of the original lease." Id. at 772-73. Finding that the "extensive remodeling resulted in additional leasable space for New Market" and that "the construction costs constituted capital improvements that ultimately benefitted New Market," the court held such items were "not chargeable as mitigation expenses." Id. at 777.

97. The New Market Court also denied recovery of expenses incurred in relocating existing tenants to make room for California Fitness. Id. at 778. The court held that "[w]hile New Market may have decided to relocate [the existing tenant] in order to accommodate California Fitness' demand for additional space, this decision ultimately benefitted New Market because it created more leasable space [and] by expanding the space . . . New Market was able to increase its rental income." Id. at 779.

98. In sum, in a well-supported and well-reasoned opinion, the New Market court considered and either rejected or significantly limited each of the categories of expenses that Chase seeks to recover in this case. Further, the plaintiff in that case did not even have the temerity to propose Chase's "rent allocation" theory, under which the former tenant is credited with only a portion of the new, larger tenant's rent. In that case, as in the present case, the only reason that the landlord was able to reap the benefit of renting larger premises is because the old tenant was no longer present.

99. In fact, the circumstances here are even less favorable to Chase's position. Chase did not merely rebuild or expand the Calder's premises, it demolished the building and replaced it with a new and much larger structure. It has entered into a ground lease with a Class-A tenant that may extend as long as fifty years, on terms much more favorable to Chase in virtually every respect than the former Calder's lease terms.

100. Chase's own damages analysis, taken in the full context of the other facts of this case, shows that its decision to proceed with the Lowe's transaction made perfect short-term and long-term economic sense for Chase. In fact, if Calder had been in place as a tenant when Chase was approached by Lowe's, Chase may well have offered Calder an inducement to leave, as it did other tenants, so that the Lowe's project could proceed.

101. The most reasonable view of damages in this case is that Chase created impediments to reletting the premises that discharged any obligation of the guarantor of the Calder lease. Chase granted exclusive uses and restrictions that ruled out entire classes of prospective tenants and materially increased the risk of the guarantor without the guarantor's consent.

102. Chase also consciously determined not to pursue an opportunity to obtain Burlington Coat as a suitable replacement tenant when approached by Burlington Coat's leasing agent as Ames was on the verge of rejecting the lease in bankruptcy. **(Ex. 6, Ex. 7)** At that time, there was owed at most a small pre-petition claim rent claim. Whether Chase determined not to pursue the opportunity to mitigate in February 2003 because it was aware that the exclusives it had granted to Bob's were an impediment or because it wished to maximize the long-term value of the center by pursuing a more favorable tenant and lease, neither decision is properly chargeable to May as guarantor.

103. Chase also asserts that there is no certainty it would have concluded a lease with Burlington Coat had it sought to do so. While one cannot be completely certain of the outcome, what appeared to have been a ripe opportunity to enter into a lease was lost because Chase rejected the overtures of Burlington Coat and sought instead to impose on May the obligation to pursue a direct lease arrangement. This was a fundamental failure by Chase to take reasonable

steps to mitigate its damages. Any uncertainty as to the ultimate conclusion of a Burlington Coat lease must be resolved against Chase because its failed to pursue the opportunity.

104. Even if Chase had reasonable grounds not to pursue a lease with Burlington Coat in February 2003, its claim for damages terminated, at the latest, in February 2004, when Chase again was presented with an opportunity to pursue a Burlington Coat lease and chose instead to go down the path of a new economic venture with Lowe's.

105. Under either scenario, Chase has failed to present evidence that would permit the Court to calculate its reasonably recoverable damages with any certainty. See KRT v. Just the Kitchen, 2000 Ct. Sup. 5321, Case No. 550778 (Super. Ct. Judicial District of New London, May 4, 2000) (refusing recovery where proof did not permit a determination of the portion of claimed mitigation costs actually attributable to tenant's breach) (Attached at Tab C), citing Beverly Hills Concepts v. Schatz & Schatz, Ribicoff & Kotkin, 247 Conn. 48, 70 (1998) (damages must be based upon reasonable assumptions supported in the evidence).

For all of the foregoing reasons, judgment will enter for the defendant.

                                      **Respectfully submitted,**

                                      **DEFENDANT**
                                      **THE MAY DEPARTMENT STORES COMPANY**

                                      By _/s/ Matthew J. Corcoran_
                                      Jeffrey J. Tinley (ct00765)
                                      Matthew J. Corcoran (ct24861)
                                      Tinley, Nastri, Renehan & Dost
                                      60 North Main Street, 2nd floor
                                      Waterbury, CT  06702
                                      Telephone: (203) 596-9030
                                      Facsimile: (203) 596-0036
                                      E-mail: jtinley@tnrdlaw.com
                                                  mcorcoran@tnrdlaw.com

## Certificate of Service

This will certify that a copy of the foregoing was mailed, postage prepaid, this 6th day of July 2006 to:

Richard P. Weinstein, Esq.,
Weinstein & Wiser, P.C.
29 South Main Street, Suite 207
West Hartford, CT 06107

_____
Matthew J. Corcoran