# EXHIBIT B

**Loislaw Federal District Court Opinions**

KALLMAN v. TANDY CORP., (N.D.Ill. 2001)

JUDITH ALTER KALLMAN, Plaintiff, vs. TANDY CORP. and RADIO SHACK

CORP., Defendants.

Case No. 99 C 490.

United States District Court, N.D. Illinois,

Eastern Division

January 16, 2001.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

MATTHEW F. KENNELLY, District Judge.

This is an action for breach of a lease. The Court has jurisdiction under **28 U.S.C. § 1332**. Following the Court's entry of summary judgment for plaintiff on the issue of liability, see Kallman v. Tandy Corp., No. 99 C 490, 2000 WL 283074 (N.D.Ill. Mar. 9, 2000), a bench trial was held on the issue of damages. The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Findings of Fact

1. Color Tile's lease

Plaintiff Judith Alter Kallman owns real estate located at 1224-26 Ogden Avenue, Downer's Grove, Illinois, which includes a building zoned for commercial use. In 1974, Judith's predecessor in interest, Parknat Properties, Inc., entered into a 15 year lease of the property to Color Tile, Inc., with an option to renew for 10 years. In 1988, Color Tile exercised the option to renew the lease for a term to end on April 30, 1999. Defendant Tandy Corporation, now known as Radio Shack Corporation,**[fn1]** guaranteed Color Tile's obligations under the lease for the original term and the optional extension.

Color Tile's lease was a "triple net" lease for the entire property, meaning that Color Tile was obligated to pay the real estate taxes, insurance, and utilities for the property and was responsible for maintenance and repairs. With regard to the latter points, the lease contained the following provisions:

> Section 5:01. Repairs. Lessee shall, at its own expense, keep all buildings or improvements now or hereafter placed on the demised premises during the lease term in good order and repair; Lessee shall be liable for repair to the roof and for any structural failure of the building. . . .
>
> . . .

   Section 13:01. Liability for Return of Premises. At
   the expiration of this lease, Lessee shall surrender
   the demised premises in the same condition as the
   demised premises were in upon delivery of possession
   to the Lessee under this lease, reasonable wear and
   tear, loss by condemnation, casualty (excluding
   casualty or loss caused by the negligence, or
   intentional or willful misconduct of Lessee, or
   Lessee's officers, employees, or agents), fire, the
   elements and their parties, or other cause excepted.

PX 71. During the last five years of the lease, Color Tile owed base rent of $9.85 per square foot, or $6,893.55 per month. It paid rent to Kallman via WIN Properties, Inc., which managed the property for Kallman. Color Tile sublet a portion of the building to TJ's Restaurant and Pancake House, Ltd., which paid its rent to Color Tile.

   2. The amounts sought by Kallman

In early 1996, Color Tile filed a petition for reorganization under Chapter 11 of the Bankruptcy Code. It vacated its portion of the property on or about February 1, 1996 and returned the keys to WIN around February 15. Color Tile failed to pay rent, real estate taxes, insurance, and utilities from February 1, 1996 on.

Kallman seeks to recover the unpaid rent, taxes, insurance and other expenses owed by Color Tile, less the amounts collected from replacement tenants; expenses of reletting the property, including broker's commissions and attorney's fees; and the amounts Kallman paid to have work done to repair or replace the parking lot, roof, and rooftop HVAC units. Tandy argues that it is not liable for the repair work and that Kallman should not be able to recover her remaining losses because she failed to make reasonable efforts to mitigate her damages.

   a. Unpaid rent, taxes, utilities, and cleanup expenses

From February 1996 through the end of the lease, Color Tile's unpaid base rental obligation totaled $268,848.45 (39 months @ $6,893.55). The real estate taxes, for which Color Tile was likewise responsible under the lease, totaled $30,893.12 for this same period. After Color Tile abandoned the property, WIN took steps to inspect the property, remove trash, have the utility bills forwarded to WIN, and perform snow removal as necessary. Through WIN, Kallman paid the following charges following Color Tile's abandonment and prior to finding a replacement tenant for the Color Tile space:

```
1996 trash removal            $      222.50
1996 utilities                     1,136.91
1997 utilities                     4,342.54
1998 utilities                     2,307.46
1997 insurance                     1,130.00
1998 insurance                       330.00
1997 snow removal                    220.00

TOTAL                         $    9,689.41
```

   b. Amounts recovered by efforts to mitigate

After Color Tile's abandonment of the property, Kallman mitigated her damages in part by entering into a direct lease with TJ's for the portion of the property that it had sublet from Color Tile. On March 12, 1996, WIN entered into a month-to-month lease with TJ's at a rate of $10.00 per square foot ($2666 per month), plus its pro rata share of the real estate taxes and insurance. TJ's also agreed to pay the utilities for its portion of the premises. In October 1998, TJ's entered into a term lease for its portion of the property, extending through October 2003, at the same monthly rental rate. All told, from March 1996 through April 30, 1999 (the end of Color Tile's lease term), TJ's paid a total of $113,576.56 for rent, taxes, and insurance. In October 1998, Kallman entered into a term lease with Happiness Is Pets, Inc. ("HIP") for the Color Tile space, pursuant to which HIP was to begin paying rent in February 1999 at a rate of $11 per square foot ($4858.33 per month). The lease extended through January 31, 2004. Through April 30, 1999, HIP paid Kallman a total of $13,932.11 for rent, taxes, and insurance.

c. Net amount claimed by Kallman

The shortfall of rent, tax, insurance, utilities, and other expenses (exclusive of repairs, commissions, and attorney's fees) that Kallman seeks to recover from Tandy may be summarized as follows:

| Amounts owed by Color Tile | | Amounts received in mitigation | |
|---|---|---|---|
| Rent due from Color Tile | $268,848.45 | Amounts paid by TJ's | $113,576.56 |
| Taxes paid by Kallman | 46,573.00 | Amounts paid by HIP | 13,932.11 |
| Other expenses paid by Kallman | 9,689.41 | | |
| TOTAL DUE | $325,110.86 | TOTAL RECEIVED | $127,508.67 |
| Less: Amount received | -127,508.67 | | |
| NET DUE | $197,602.19 | | |

d. Repair/replacement expenses

Kallman also seeks to recover from defendants the amounts she expended to make certain repairs and/or replacements on the property. When Color Tile abandoned the property in February 1996, it left in disrepair the parking lot, the roof, and two of the five heating, ventilation, and air conditioning (HVAC) units located on the roof. Kallman ultimately caused work to be done to repair and/or replace these items. We will discuss the details of this infra at 9-11.

e. Brokerage commissions & attorney's fees

Finally, Kallman seeks to recover as mitigation expenses the $14,443.89 she paid to Peters as a commission in connection with the HIP lease, and the $8,724.50 in attorney's fees that she incurred and paid in connection with negotiations with prospective tenants. Kallman also seeks to recover her attorney's fees and expenses in connection with the prosecution of this action, pursuant to Section 18:06 of the lease, which provides that in an action for breach of the lease, the prevailing party shall recover its reasonable attorney's fees. The Court has deferred consideration of the latter issue until after entry of judgment.

3. Kallman's efforts to mitigate damages

a. Hiring a real estate agent

On February 20, 1996, WIN representative Thomas Mirandi spoke to a local real estate agent, Nick Peters, about listing the property. Peters was a well-qualified real estate agent with extensive knowledge and experience regarding rental of commercial real estate in the area. Peters inspected the property around March 1, and on March 19, he sent Mirandi a marketing proposal. In his proposal, Peters described the property's appearance and condition as "fair to good." However, Peters specifically noted that the parking lot was in "fair" condition, had some potholes, and "needs patching, sealing and striping." He also reported that the building required some repairs, including the drywall in the back room, the receiving doors, the furnace, and the hot water heater, and he stated that the outside of the building was "dated." Peters suggested that "a general clean up and repair should be conducted throughout the vacant portion of the property," which he said "will enhance the leasability of the property and help ownership maximize its rental rate." PX 3.

With regard to market conditions, Peters reported that the retail leasing market in the area was "active" and that a number of spaces of similar size were available, leading to "a drop in rental rates in many of the small and medium strip [shopping] centers." Peters stated that based on market conditions and the condition of the property, he expected the property to lease "in the range of $8.00 to $12.00 per square foot." Significantly, however, Peters advised that if the property was left in its current unimproved state, "we would most likely be looking at the $8.00 to $9.00 per square foot range." Id.

There was an extended delay before WIN concluded a listing agreement with Peters. After receiving Peters' March 19 proposal, Mirandi did not send Peters a draft agreement until April 10, 1996. Negotiations took place over a period of more than six weeks, a pace that is best described as somewhere between leisurely and lackadaisical on WIN's part. Peters signed the final agreement on May 31, but the agreement was not signed on WIN's behalf until June 28, and it was not returned to Peters until July 17. Thus four months passed from the date of Peters' proposal before he was actually able to start marketing the property — including six weeks after Peters had signed the agreement.

The Court did not find credible or persuasive Mirandi's testimony that the agreement with Peters was concluded within a reasonable period of time. Kallman has offered no good reason why WIN, a manager of substantial amounts of property negotiating with an experienced listing agent, could not have finalized an agreement with Peters within two or three weeks after getting his proposal — even if the process included review by counsel. In short, Kallman reasonably should have executed a listing agreement with Peters by the first week of April at the latest. There is no way of knowing how many prospective tenants were lost in the ensuing three and one-half months, but there is every reason to believe that some were.

During the period that the Listing Agreement was being negotiated, Mirandi took some steps to market the property. He placed an ad in the May 1996 issue of a national commercial leasing magazine, and he sent mailings of some 500 advertising fliers to brokers and national commercial tenants. However, WIN did nothing to list the property

locally, and there is no evidence that it posted a sign on the property indicating that it was for rent. Mirandi's efforts produced no real prospects prior to Peters' entry onto the scene.

   b. Peters' efforts to find a replacement tenant

   The listing agreement with Peters provided for a commission of 5% of the annual base rent during the first five years of a lease procured by Peters, with the rate dropping to 2.5% for the sixth through tenth years. An addendum to the listing agreement provided that the offering rent would be $12.00 per square foot. This was the top end of the rental range Peters had projected if (and only if) repairs were made. WIN, however, decided not to make any repairs or improvements to the property before offering it for lease. Indeed, WIN determined not to make any repairs before actually securing a new tenant. It was willing to negotiate a repair / improvement allowance with a replacement tenant as part of a new lease, but it was unwilling to make any repairs in order to improve its prospects for attracting tenants. Despite this, WIN targeted the top of the rental range predicted by Peters for the property in fully-improved state.

   Once the listing agreement with Peters was executed, he began to market the property to prospective tenants. He put up a sign on the property stating that it was for rent (the first time this had been done in the five months since Color Tile had abandoned the property); he sent mailers to other retail brokers in the area; he called on numerous companies to suggest the property for rental; he eventually showed the property to some 40 prospective tenants; and he was the point person in negotiating with interested prospects. Peters had discussions with a prospective tenant, Nevada Bob's, within a week or two after he was retained. This indicates to the Court that if the agreement with Peters had been concluded by early April, Peters would have had prospects looking at the property a full three months earlier than ended up being the case. Peters made a valiant effort to relet the property, but he was hamstrung by WIN's insistence on not making any repairs until after a new tenant was signed up, as well as by WIN's hard bargaining with prospects. Mirandi was less concerned with reletting the property for the remainder of the Color Tile lease term than he was with maximizing Kallman's return over the long haul. WIN's effort consistently was to seek to obtain a rent figure well in excess of what Peters had advised was reasonable for the property in its unrepaired and unimproved state, and indeed in excess of the $9.85 per square foot that Color Tile was obligated to pay. The evidence showed that this made it virtually impossible for Peters to conclude a deal with any of the prospects. The Court finds that WIN's stance kept some prospects away altogether and drove others away after they had expressed serious interest in the property.

   In August 1998, Peters proposed Happiness Is Pets Of Naperville, Inc. ("HIP") as a tenant for the Color Tile space. Peters and WIN negotiated with HIP, and WIN's attorney prepared and submitted a proposed lease to HIP. A lease was executed on October 15, 1998, pursuant to which HIP agreed to pay Kallman rent of $11.00 per square foot starting in February 1999, plus a pro rata share of the real estate taxes and insurance for the property. HIP took possession of the property "as is" in October 1998 and used the period prior to February to make necessary interior improvements.

   4. Repairs to the roof, parking lot, and HVAC units

The evidence showed that when Color Tile surrendered the property to Kallman in February 1996, the roof was in very poor condition, and there were numerous leaks. Because Color Tile had not properly maintained the roof, by 1996 it was no longer possible to repair the roof by simply making patches. Due to the multiple layers that had been added to the roof, and the moisture that had collected between the layers, the only viable course was to replace the roof. The Court credits the testimony of plaintiff's witness Glenn Salzman that it would have taken the roof five to ten years of neglect to reach the deteriorated state that existed when Color Tile surrendered the property.

The parking lot likewise was in poor condition at the time of Color Tile's abandonment of the property. It included numerous pot holes, a good deal of cracking and some drainage problems. The Court credits the testimony of plaintiff's witness Daniel Whalen that it would have taken more than five years of neglect to reach that stage. Work was likewise required on the roof HVAC units. Of the five units on the roof, two required replacement and the others required repair. These too had been allowed to deteriorate for a significant period during Color Tile's tenancy.

WIN hired Robert Slanker & Associates Ltd. ("RSA"), a general contractor, to inspect the property in August 1996. RSA advised WIN that two of the existing HVAC rooftop units needed to be replaced because they were at least 20 years old, had not been serviced for 3 to 5 years, had rusted heat exchangers and pilots, and could not feasibly be repaired. Consistent with its decision not to make repairs until a replacement tenant was lined up, however, WIN did not pursue making repairs at that time.

As indicated earlier, in October 1998 Kallman entered into a five year lease with TJ's for the portion of the property that it had been occupying as a subtenant of Color Tile. TJ's agreed to enter into a long term lease only after Kallman agreed to replace the roof of the building and resurface the parking lot. WIN obtained opinions and estimates from two roofing contractors regarding the necessary roof work. It hired the low bidder, Adler Roofing, which completed the necessary roof work in or about May 1998, at a cost of $41,374. WIN also obtained opinions and estimates from two paving contractors for the work on the parking lot. It hired the low bidder, The Patching People, Inc., to perform the work, which was completed in or about August 1998 at a cost of $19,710.

In order to obtain the HIP lease in October 1998, Kallman agreed to replace the worn out rooftop HVAC units, as RSA had advised back in August 1996. In addition, as a condition of entering into its lease, HIP insisted that Kallman replace the exterior doors of the premises and add protective posts known as bollards outside the building near the gas and electric meters. After the lease was finalized, WIN asked RSA to perform this work. The total cost to plaintiff for the work was $19,756, which was paid to RSA in December 1998. Of this, approximately $2,000 was attributable to the doors and bollards, and the remainder was attributable to the HVAC work. Kallman also incurred and paid $1,700 for the cost of removing Color Tile's sign so that HIP could construct and install its own sign.

Conclusions of law[fn2]

Color Tile defaulted on its obligations under the lease by abandoning the property and failing to pay the rent, taxes, utilities, insurance,

and snow and trash removal charges. Tandy guaranteed each and every obligation of Color Tile under its lease.

As indicated earlier, the Court previously granted summary judgment for Kallman on the issue of liability. All that remains to be determined is the amount of damages to which Kallman is entitled. As the Court has previously held, "[d]amages in a case of this type consist of the rents owed, plus costs incurred in obtaining and maintaining a mitigating lease, less a credit for rents obtained under a mitigating lease." Kallman, 2000 WL 283074, at *4 (citing In re Handy Andy Home Improvement Centers, Inc., No. 95 C 21655, 1998 WL 603252, at *4 (Bankr.N.D.Ill. Sept. 11, 1998); Pioneer Trust & Savings Bank v. Zonta, 96 Ill. App.3d 339, 345, 421 N.E.2d 239, 245 (1981)). Kallman has also made a claim for recovery of her repair costs, either as expenses of mitigation or as damages for Color Tile's breach of its lease obligations regarding repair and maintenance.

1. Reasonableness of Kallman's efforts to mitigate damages

Under Illinois law, "a landlord . . . shall take reasonable measures to mitigate the damages recoverable against a defaulting lessee." 735 ILCS 5/9-213.1. Under this statute, the landlord bears the burden of proving that she met her duty to mitigate. Kallman, supra, at *5 (citing St. Louis North Joint Venture v. P & L Enterprises, Inc., 116 F.3d 262, 265 (7th Cir. 1997); St. George Chicago, Inc. v. George J. Murges & Associates, Ltd., 296 Ill. App.3d 285, 293, 695 N.E.2d 503, 509 (1998); Snyder v. Ambrose, 266 Ill. App.3d 163, 166, 639 N.E.2d 639, 640-41 (1994)). The landlord must use reasonable diligence and ordinary care in attempting to minimize her damages; damages that could have been reasonably avoided are not recoverable. St. George Chicago, 296 Ill. App.3d at 293, 695 N.E.2d at 509. However, the landlord's failure to make reasonable efforts to mitigate is not a complete bar to her recovery of damages; rather, it operates as a reduction of the amount recoverable. Id. Specifically, the amount of loss that the landlord reasonably could have avoided by reasonable mitigation efforts is subtracted from the amount that she otherwise would be able to recover. Id. (citing Restatement 2d of Contracts § 350, comment b, at 127 (1979)).

The Court concludes that Kallman failed to demonstrate that she took reasonable measures to mitigate her damages. It took her over two and one-half years to find a tenant for the portion of the building that Color Tile had vacated (three years to actually start taking in rent payments). This extended delay resulted largely from four factors. First, Kallman did not act reasonably in taking nearly five months after Color Tile turned over the keys to conclude a listing agreement with a real estate agent. Second, she steadfastly refused to make improvements to the interior of the property in order to attract prospective tenants. Third, Kallman failed to follow Peters' recommendation regarding the asking price. And finally, in dealing with prospective tenants, Kallman's negotiation strategy was antithetical to her obligation to use reasonable efforts to mitigate, primarily because she consistently sought to achieve a rental figure that was higher than what Color Tile had been paying and what Peters advised that a new tenant would be willing to pay. We discuss these points in turn.

It was certainly reasonable for Kallman to hire Peters to market the property, but it took her an unreasonably long time to get Peters on board. If Kallman had made a reasonable effort to conclude a deal with a

real estate agent, she would have had an agreement by early April 1996 at the latest. Instead, WIN dragged its feet, taking several months to conclude a standard, routine agreement that should have taken no more than two or three weeks to finalize. This delay is illustrative of plaintiff's general approach to reletting the property: she was looking at the task at hand as a long term project, with a goal of maximizing her return over the long haul, rather than one focused on mitigating her damages in the three years that remained on Color Tile's lease. Once it hired Peters, WIN did not listen to him. It failed to follow his recommendation regarding the monthly rent that Kallman reasonably could expect to obtain from a new tenant. WIN's contract with Peters directed him to seek a rent of $12 per square foot. Mirandi testified that he was willing to come down from this figure and that his strategy was to start out at a higher price than he hoped to end up at. But Mirandi's suggestion that he was willing to come down to the range that Peters believed the market would bear was lacking in credibility, and in fact WIN fought tooth and nail for every penny with each of the prospects that Peters brought to the table. In the abstract, there is certainly nothing wrong with a property owner trying to get as good a deal for itself as it could. But in this case WIN was basically working on Tandy's account. The mitigation statute requires not that the landlord make reasonable efforts to maximize its long term return, but rather reasonable efforts to mitigate its damages. What might be reasonable for a landlord that is eating its own losses is not necessarily reasonable when it is able to shift its losses to a third party.

When it obtained reasonable proposals from realistic prospects, WIN's strategy was to negotiate in an effort to maximize Kallman's long term return, both by having as high a starting rental rate as possible, and by securing a lease for a term extending well beyond the term of Color Tile's lease. WIN's sacrifice of short-term results in favor of long-term gain failed to comport with its duty to make reasonable efforts to mitigate his damages for the remainder of the term of Color Tile's lease. In addition, WIN's consistent attempt to achieve a monthly rental figure higher than the amount its defaulting tenant had been paying, though perhaps not per se unreasonable, is strong evidence that its efforts to mitigate were not reasonable. MBC, Inc. v. Space Center Minnesota, Inc., 177 Ill. App.3d 226, 234-35, 532 N.E.2d 255, 260-61 (1988).

Finally, WIN ignored Peters' reasonable recommendations regarding repairs to the property. He recommended that Kallman do (among other things) the work necessary to put the property in "vanilla box" condition, [fn3] inspect the roof, and determine the status of the HVAC units. Putting the property in vanilla box condition would have been consistent with general custom and practice in the real estate business and would have aided WIN's and Peters' efforts to relet the property. WIN's insistence on marketing the property "as is" drove away prospective tenants. In sum, the Court concludes that Kallman failed to meet her statutory obligation to take reasonable measures to mitigate her damages. If she had promptly retained a real estate agent, performed the necessary work, and adopted a reasonable negotiating stance, it is reasonable to believe that she would have been able to relet the property within six to eight months after it was abandoned by Color Tile. For this reason, Kallman cannot recover any rent, taxes, or other expenses incurred after October 15, 1996. Her damages for lost rent, tax, insurance, utilities, and snow and trash removal consist only of those sums that would have been owed by Color Tile for the period through October 15, 1996, less any amounts received from TJ's for that same

period. Kallman may recover the following amount:

| Amounts owed by Color Tile | | Amounts received from TJ's | |
|---|---|---|---|
| Rent (8.5 months @ $6,893.55): | $58,595.18 | Rent (8.5 months @ $2,666): | $22,6( |
| Taxes (1996 payments only): | 10,761.02 | | |
| Utilities: | 1,136.91 | | |
| Trash removal: | 222.50 | | |
| TOTAL DUE: | $70,715.61 | | |
| Less: Amounts received from TJ's: | 22,661.00 | | |
| NET DUE: | $48,054.61 | | |

2. Broker's commission and attorney's fees

Kallman requests recovery of the broker's commission she paid to Peters for the HIP lease and the attorney's fees she paid in connection with negotiations with prospects. The Court will award only that portion of the commission that is attributable to the part of HIP's lease that covered the remaining term of Color Tile's lease — i.e., through April 30, 1999 only. Accordingly, Kallman may recover $697 (5% of the amount paid by HIP through the end of the Color Tile lease). The remainder of the commission cannot be said to have been incurred in connection with mitigating Kallman's damages during the term of Color Tile's lease.

Of the attorney's fees claimed by Kallman as mitigation expenses, $2754.25 was incurred through October 1996 in connection with the listing agreement with Peters, the TJ's month-to-month lease, and negotiations with other prospective tenants. The remainder was incurred in 1998, primarily in connection with negotiations with TJ's and HIP for their long term leases that extended well beyond Color Tile's lease term. The Court finds and concludes that the amounts incurred through October 1996 constitute reasonable mitigation expenses; the remaining amounts do not, as they were incurred in connection with efforts primarily geared at maximizing Kallman's return beyond the Color Tile lease term.

3. Expenses for work on roof, HVAC units, and parking lot

Kallman contends that the sums that she expended for repairs to the roof, replacement of the rooftop HVAC units, and resurfacing of the parking lot were reasonable mitigation expenses, and alternatively that these were sums that may be charged to Color Tile (and thus to Tandy) under Color Tile's lease.

a. Mitigation expenses?

In the Court's March 6, 2000 Memorandum Opinion and Order, we set forth the law concerning Kallman's ability to recover mitigation expenses as follows:

> Kallman is entitled to recover expenses reasonably
> incurred to mitigate her damages. See Handy Andy
> [Home Improvement Centers, Inc., No. 95 B 21655, 1998

```
WL 603252], at *5 [(Bankr.N.D.Ill. Sept. 11, 1998)];
Pioneer Trust [& Savings Bank v. Zonta,
96 Ill. App.3d 339, 346, 421 N.E.2d 239, 245 (1981)].
She may recover as mitigation expenses those capital
costs necessarily expended to obtain successor
tenants, but she may not recover capital costs that
represent long term capital improvements yielding a
betterment to the leasehold, see Handy Andy, at *5;
Pioneer Trust, 96 Ill. App.3d at 346, 421 N.E.2d at
245; In re Andover Togs, Inc., 231 B.R. 521, 537
(Bankr.S.D.N.Y. 1999), absent some term in the lease
that requires the tenant to pay for such expenses.
```

Kallman v. Tandy Corp., 2000 WL 283074, at *7.

Applying this standard, the Court concludes that the amounts spent on work on the roof, HVAC units, and parking lot were not reasonable mitigation expenses. In this regard, we do not evaluate matters as they might have been had Kallman undertaken this work in 1996, when nearly three full years remained on the lease. Rather, we evaluate things as they actually occurred. Kallman had all these repairs made in mid-1998, when only a few months remained on Color Tile's original lease obligation. The work on the roof and parking lot was done only at the behest of TJ's, which insisted that these repairs be completed not as a condition of its month-to-month lease, but rather as a condition of entering into a new long term lease with Kallman. Kallman did not incur these expenses to mitigate her damages during the Color Tile lease term; rather, she incurred them to obtain a long term lease that extended well beyond April 30, 1999. There is no indication that Kallman would have had the repairs done unless TJ's had insisted on them as a condition for its long term lease.

Similarly, the replacement of the HVAC units was done only because HIP insisted that it be done as a condition of entering into a long term lease for the part of the property that Color Tile had occupied. There is no evidence indicating that Kallman had any intention of making the repairs until its replacement tenant insisted on them in order to enter into a long term lease. The leases with TJ's and HIP that precipitated the work both extended well beyond the period of Color Tile's lease, which would have terminated April 30, 1999. TJ's lease ran from October 1998; HIP's rental obligation under its lease started in mid-February 1999. The repairs / replacements all had a useful life that extended many years beyond Color Tile's lease term. In sum, plaintiff failed to establish that these expenses were reasonably incurred in order to mitigate her losses from the Color Tile lease; rather they were incurred primarily in order to maximize her revenues beyond the period for which Color Tile (and thus Tandy) was liable.

  b.  Lease obligations?

The Court's conclusion that the expenses for work on the roof, HVAC units, and parking lot are not reasonable mitigation expenses does not foreclose Kallman's effort to recover these expenses from Tandy. She also argues that Color Tile was obligated to do this work during the term of the lease, both because this is implicit in the fact that the lease was a "net lease" and by virtue of specific provisions of the lease.

The Court rejects the former argument. Even if the fact that the lease is a "net lease" or "triple net lease" suggests an implicit obligation to

repair or replace, that does not necessarily mean that the tenant is required to make replacements that amount to capital improvements that largely will benefit later tenants. Kallman has cited no Illinois cases which so hold; indeed the Illinois precedent that exists on this topic indicates exactly the opposite. In Sandelman v. Buckeye Realty, Inc., **216 Ill. App.3d 226**, **576 N.E.2d 1038** (1991), the court considered a "`triple-net lease,' wherein tenant is responsible for real estate taxes, maintenance and insurance expenses." Id. at 227, 576 N.E.2d at 1038. Nonetheless, the court concluded that a lease clause which, like section 13.01 of Color Tile's lease, required the tenant to "yield up said premises to Landlord in good condition and repair (ordinary wear excepted)," did not require the tenant to replace a roof that had become so run down that it could not be repaired. The lease also required the tenant to keep the property "in good repair" during the term of the lease; the court concluded that this "merely binds [the tenant] to make the ordinary repairs reasonably required to keep the premises in proper condition; it does not require him to make repairs involving structural changes, or to make renewals and replacements which would last a lifetime." Id. at 230, 576 N.E.2d at 1040. To shift these burdens to the tenant, the court said, "the warrant for the change should be plainly discoverable in the lease." Id.

Kallman also argues that Color Tile's failure to make necessary repairs to the property constituted a breach of section 5.01 of the lease, which required Color Tile to keep the building "in good order and repair" during the term of the lease and specifically made Color Tile "liable for repair to the roof."

The evidence regarding the roof reflects that Color Tile neglected the roof for years. The damage to the roof did not constitute "reasonable wear and tear"; it was due to the nature of the repairs performed by Color Tile (repeatedly adding new layers rather than at some point replacing the roof as reasonable prudence would require) that the roof ended up in the poor condition in which plaintiff found it after Color Tile surrendered the property. In sum, the Court concludes that with respect to the roof, Color Tile breached its obligations under § 5.01. This necessitated replacement of the roof, making the cost of replacement recoverable by Kallman as damage directly stemming from Color Tile's breach.

Similarly, Kallman established by a preponderance of the evidence that the poor condition of the HVAC units and the parking lot which required the work done in 1998 was directly caused by Color Tile's failure to meet its obligation to repair and maintain these items during the term of the lease. For this reason, Kallman is entitled to recover the expenses she incurred for this work.**[fn4]**

4. Expenses for sign removal and replacement of bollards and doors

Kallman may recover the $1700 that she paid to have Color Tile's sign removed from the property. This was a reasonable expense that was necessary in order for her to obtain a replacement tenant for the Color Tile space, whether that tenant was planning to be there only through April 30, 1999 or for a longer term. She may not, however, recover the $2000 spent to replace the bollards near the utility meters and to replace the exterior doors, as she has failed to introduce evidence sufficient to show that these were actual mitigation expenses as opposed to long term improvements made only in order to secure a lease extending years past the end of Color Tile's lease term.

5. Prejudgment interest

Pursuant to Section 14:01 of the Color Tile lease, Kallman is entitled to recover prejudgment interest calculated at 10% per annum of her damages for breach of the lease. The Court awards Kallman $46,636.82 in prejudgment interest on the amounts awarded, with the exception of the broker's commission and attorney's fees. The basis for the calculation of this amount is found in Appendix A.

## Conclusion

The Court directs the Clerk to enter judgment in favor of plaintiff and against defendants in the amount of $132,045.86, plus $46,636.82 in prejudgment interest, for a total of $178,682.68. A breakdown of this calculation appears in Appendix B. Kallman's request for attorney's fees and expenses in connection with the prosecution of this litigation shall proceed in the manner provided in N.D. Ill. LR 54.3.

[fn1] Kallman originally brought this action against Tandy; she added Radio Shack as a defendant after Tandy changed its name. We will refer to both defendants as "Tandy."

[fn2] Any findings of fact contained in this section shall be considered as such.

[fn3] "Vanilla box" condition, as that term is used in the real estate business, means that the property has drywall walls, sanded and ready to be primed; a drop ceiling with lighting; a concrete slab floor ready for floor finishing; a toilet room with fixtures; electrical lines distributed throughout; and rooftop HVAC units.

[fn4] Though a similar clause (without the specific reference to the roof) existed in the lease in Sandelman, in that case there was no indication that the tenant's failure to properly maintain the property during the term of the lease contributed to the property's poor condition. Rather, the issue in Sandelman concerned a roof which had lasted well beyond its useful life and had essentially deteriorated by normal wear and tear. The same is not true here.

APPENDIX A — Calculation of prejudgment interest

Unpaid rent, taxes, utilities, and other expenses

Kallman's damages include unpaid rent, taxes, utilities, and other expenses from February 1, 1996 through October 15, 1996, less the amounts collected from TJ's Restaurant for that same period.

Rent

Interest on the following amounts is calculated at 10% per annum from the date each payment was due, through January 15, 2001.

```
2/1/96:  $6893.55 — $2666.00  =  $4227.55  x  0.1  x  59.5/12  =  $2096.16
3/1/96:  $6893.55 — $2666.00  =  $4227.55  x  0.1  x  58.5/12  =  $2060.93
4/1/96:  $6893.55 — $2666.00  =  $4227.55  x  0.1  x  57.5/12  =  $2025.70
5/1/96:  $6893.55 — $2666.00  =  $4227.55  x  0.1  x  56.5/12  =  $1990.47
6/1/96:  $6893.55 — $2666.00  =  $4227.55  x  0.1  x  55.5/12  =  $1955.24
7/1/96:  $6893.55 — $2666.00  =  $4227.55  x  0.1  x  54.5/12  =  $1920.01
```

```
8/1/96:   $6893.55 - $2666.00  =  $4227.55  x  0.1  x  53.5/12  =  $1884.78
9/1/96:   $6893.55 - $2666.00  =  $4227.55  x  0.1  x  52.5/12  =  $1849.55
10/1/96:  $3446.78 - $1333.00  =  $2113.78  x  0.1  x  51.5/12  =   $907.16
```

TOTAL:  $16,690.00

Tax payments

```
5/17/96:  $5380.51  x  0.1  x  56/12   =           $2510.90
8/28/96   $5380.51  x  0.1  x  52.5/12 =           $2353.97
5/20/97:  $4997.80  x  0.1  x  44/12   =   $1832.53
8/20/97:  $4997.80  x  0.1  x  41/12   =   $1707.58
5/21/98:  $5068.25  x  0.1  x  32/12   =   $1351.53
8/31/98:  $5068.25  x  0.1  x  28.5/12 =   $1203.71
```

TOTAL: $10,960.22

Utilities and trash removal

Interest on the following amounts has been calculated from October 15, 1996 through January 15, 2001, a period of 51 months:

```
1996 trash removal:  $    222.50  x  0.1  x  51/12  =   $94.56
1996 utilities:          1,136.91  x  0.1  x  51/12  =  $483.19
```

Cost of repairs to roof, HVAC units, and parking lot; sign removal

Roof repairs

The roof repairs were paid for on various dates in August and December 1998. For ease of calculation, interest has been calculated on the entire amount using the date of September 15, 1998.

$41,374 x 0.1 x 28/12 = $9653.93

HVAC repairs

The HVAC repairs were paid for in early December 1998. For ease of calculation, interest has been calculated using the date of December 15, 1998.

$17,756 x 0.1 x 25/12 = $3699.17

Parking lot repairs

The parking lot repairs were paid for in mid-August 1998.

$19,710 x 0.1 x 29/12 = $4673.25

Sign removal

The sign removal was paid for in mid-October 1998.

$1700 x 0.1 x 27/12 = $382.50

Sum of interest amounts

```
Rent:                     $16,690.00
Tax payments:              10,960.22
```

```
1996 trash removal:            94.56
1996 utilities:               483.19

Roof repairs:               9,653.93
HVAC repairs:               3,699.17
Parking lot repairs:        4,673.25
Sign removal:                 382.50

GRAND TOTAL:     $46,636.82
```

APPENDIX B — Breakdown of damage award

```
Net unpaid rent, taxes,
utilities, trash removal:    $48,054.61

Attorney's fees:               2,754.25

Broker's commission:             697.00

Roof repairs:                 41,374.00

HVAC repairs:                 17,756.00

Parking lot repairs:          19,710.00

Sign removal:                  1,700.00

TOTAL:                       $132,045.86

Plus:  Prejudgment interest   46,636.82

GRAND TOTAL:                 $178,682.68
```

Copyright © 2006 Loislaw.com, Inc. All Rights Reserved